[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12070

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 6, 2012
JOHN LEY
CLERK

D. C. Docket No. 08-00022-CR-3-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NEVILLE MCGARITY,
a.k.a. Wraith,
DANIEL CASTLEMAN,
a.k.a. Chingachgook,
GARY LAKEY,
a.k.a. Eggplant,
MARVIN LAMBERT,
a.k.a. Methuselah,
RONALD WHITE,
a.k.a. Roadkill,
JAMES FREEMAN,
a.k.a. Mystikal,
WARREN MUMPOWER,
a.k.a. Lizzard,

Defendants-Appellants.

———————————————

Appeals from the United States District Court
for the Northern District of Florida
———————————————
(February 6, 2012)

Before HULL and FAY, Circuit Judges, and VINSON,[*] District Judge.

FAY, Circuit Judge:

If "[a]ll the world's a stage" as Shakespeare wrote,[1] this case demonstrates just how much the dimensions of that stage are shrinking with the advent of the internet, at least in regards to child pornography. We are concerned here with the fruits of a cooperative, multi-national criminal investigation directed at tracking a sprawling international child pornography ring, comprised of as many as 64 known individuals sharing more than 400,000 images and 1,000 videos of child pornography across at least six countries. Ultimately, a joint task force arrested fourteen members of the ring and charged them with offenses relating to child pornography, although we have before us only the appeals of the following seven

---

[*] Honorable C. Roger Vinson, Senior United States District Judge for the Northern District of Florida, sitting by designation.

[1] William Shakespeare, "As You Like It," act 2, sc. 7.

2

defendants: Neville McGarity, Daniel Castleman, Gary Lakey, Marvin Lambert, Ronald White, James Freeman, and Warren Mumpower.[2]

Faced with a 40-count Superseding Indictment, each defendant was tried and convicted of engaging in a child exploitation enterprise ("CEE"), in violation of 18 U.S.C. § 2252A(g); conspiring to advertise, transport/ship,[3] receive, and possess child pornography, and to obstruct an official proceeding, in violation of 18 U.S.C. §§ 371, 1512(k), 2251(d)(1) and (e), and 2252A(a)(1); receiving child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2); and obstructing justice, in violation of 18 U.S.C. § 1512(c). Furthermore, all defendants but one, Ronald

---

[2] We adjudicated four of the seven other co-defendants' appeals in United States v. Wayerski, 624 F.3d 1342 (11th Cir. 2010). We affirmed all four defendants' convictions for engaging in a child exploitation enterprise ("CEE") (Count One), in violation of 18 U.S.C.
§ 2252A(g). However, we concluded that the conspiracy in Count Two was a lesser-included offense of engaging in a CEE and vacated on Double Jeopardy grounds all four defendants' Count Two convictions for conspiracy to commit multiple child pornography-related offenses and to obstruct an official proceeding, in violation of 18 U.S.C. §§ 371, 1512(k), 2251(d)(1) and (e), and 2252(a)(1) and (b)(1). Id. at 1350-51.
There were no issues raised or discussed as to the other conviction counts in Wayerski, including one co-defendant's Count Forty conviction for obstructing an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).

[3] Only defendant White was found not guilty of conspiring to transport and ship child pornography, which was one of the five underlying conspiracies specially charged by Count Two. However, White's judgment improperly reflects that he was convicted of conspiracy to transport and ship child pornography. The district court shall amend its judgment accordingly.

3

White, were tried and convicted of advertising the exchange of child pornography, in violation of 18 U.S.C. § 2251(d)(1) and (2); and knowingly transporting and shipping child pornography, in violation of 18 U.S.C. § 2252A(a)(1). Lastly, to compensate for harm to one victim depicted in the child pornography found in the defendants' possession, the sentencing judge ordered restitution against only one of the defendants, James Freeman, in the amount of $3,263,758.[4]

The defendants raise numerous issues on appeal,[5] although many require no discussion.[6] In relevant part, the defendants challenge the constitutionality of the

---

[4] For reasons that were not clarified by a meticulous review of the record or by oral argument, the Government sought restitution only from Freeman for that victim's injuries.

[5] Because of the consolidated nature of this matter, the issues raised on appeal are an amalgam of each defendant's individual claims. At trial, the district court deemed all defense objections to be joint in the absence of a defendant's election otherwise. However, there is no such uniformity on appeal. For example, one of the defendants, Warren Mumpower, has chosen not to adopt the arguments of his co-defendants; two others, Neville McGarity and Daniel Castleman, have adopted in part the arguments of their co-defendants; and yet another two, Gary Lakey and Marvin Lambert, have adopted in their entirety the arguments of their co-defendants. Where relevant, we distinguish between the parties raising the respective issue for appeal.

[6] While the defendants raise 22 issues as characterized by the Government, we find the following are meritless and do not warrant discussion:
1) whether the district court abused its discretion by overruling the defense objection to evidence that individuals in the pornography were real minors who had been abused (given most defendants had stipulated to that fact);
2) whether the district court plainly erred by admitting a CD with a label

4

CEE statute; the sufficiency of the Superseding Indictment in regards to Count One and Count Forty; certain errors the district court purportedly made both pretrial and during trial, including the district court's purported failure to issue a "unanimity" instruction regarding the CEE charge; the sufficiency of the evidence regarding Count Twenty and Count Forty; and an alleged Double Jeopardy violation based on the defendants' convictions under Counts One and Two.[7] The defendants also challenge their sentences.

---

referring to Castleman and his daughter;

    3) whether the district court erred in admitting evidence that McGarity possessed more than 50,000 images and videos of child pornography;

    4) whether the district court erred in not granting a mistrial because of the prosecutor's description of child pornography as "vile and reprehensible";

    5) whether the district court erred in not granting a mistrial because of the prosecutor's reference to the defendants as "pedophiles";

    6) whether the district court erred in admitting the defendants' own newsgroup posts;

    7) whether the district court erred in applying a sentencing enhancement for use of a computer in the commission of the defendants' offenses;

    8) whether the news service providers' business records were improperly admitted into evidence, either because they constituted impermissible hearsay or they violated Crawford v. Washington, 541 U.S. 36 (2004); and

    9) whether the district court committed cumulative error.

    [7] Having already rejected in Wayerski some similar issues to those now raised by the defendants, we are bound by the Eleventh Circuit's prior-panel rule on those same issues. United States v. Smith, 122 F.3d 1355, 1359 (11th Cir. 1997) ("Under the prior panel precedent rule, we are bound by earlier panel holdings . . . unless and until they are overruled en banc or by the Supreme Court.").

After review of the record and having had the benefit of oral argument, we vacate Ronald White's CEE conviction under Count One; vacate the other six defendants' convictions for conspiracy under Count Two; and vacate all of the defendants' convictions for statutory obstruction of justice under Count Forty. We also vacate the restitution award against Freeman and remand for further proceedings. In all other regards, we affirm.

## I.

We delineate below both the relevant factual and procedural background. As we must, we consider the factual background in the light most favorable to the Government. See United States v. Glen-Archila, 677 F.2d 809, 812 (11th Cir. 1982).

## A.

*Discovery and Infiltration of Child Pornography Ring*

In 2005, an informant notified an Australian constable, Brenden Power, and others of the Queensland Police Service of the existence of a computer ring of child pornography users, which operated exclusively through internet newsgroups.[8] The informant further notified Constable Power of which

---

[8] Newsgroups operate in the "Usenet" section of what is commonly referred to as the "internet." Much like websites, which are located on the world wide web and accessible by individuals over the internet through an internet service provider

newsgroups the ring was using, the ring's encryption method,[9] and the informant's own nickname within the ring, all of which permitted Constable Power to infiltrate the ring.

When he began monitoring the ring, Constable Power discovered the sophisticated nature of the ring's operations, both in its day-to-day operations and in its recruitment of new members. As to the former, the ring had a hierarchy in place, in which a "core" of leaders—"Yardbird," "Helen," "Soft," and "Tex"—managed the ring, its operations, and its members. To assist the core leadership, the ring also had officers tasked with specific roles, like security and administration.

Additionally, the ring had a formal process in place for gaining new members. The most involved leader, Yardbird, would identify potential members based on their online history of posting child pornography. He would subsequently invite those prospective members into the group upon completion of certain tests designed to weed out potential law enforcement infiltrators. For example, most invitees were required to find and post certain electronic files of child

("ISP"), newsgroups are accessible through a news service provider ("NSP").

[9] The child pornography ring used a commercially available software program known as Pretty Good Privacy ("PGP") to encrypt their communications into cipher or secret code.

7

pornography, as well as pass a timed child pornography test that provided 48 hours for completion.[10] Once accepted as a member, an invitee was provided with the accoutrements of membership: a PGP key that allowed him to decrypt group postings; several documents pertaining to membership;[11] and an introduction, *via* online post, to the other group members.

Perhaps the most telling proof of the ring's sophistication, though, came from Constable Power's investigation of the ring's communications. The members utilized a maze of rotating newsgroups and parallel newsgroup postings not only to communicate with one another but also to hide their communications from outsiders. As noted above, members of the ring were given separate keys for encryption of newsgroup text posts and for binary uploads containing the images and videos. The encryption keys were subject to change at Yardbird's discretion.

---

[10] Because of the illegality of posting child pornography and the extensive familiarity with child pornography required to complete the tests, it was believed by the ring members that law enforcement agents would be prevented from gaining admission into the ring.

[11] For example, one such document was entitled "Security and Encryption FAQ," and was written by somebody identifying himself as "Doctor WHO." This document was designed to "assist[] people in setting up their computer to be as anonymous on the Internet as possible" through the use of encryption. Another posted document, entitled "FAQ," provided "a very broad overview of how the group operate[d]," including reasons for certain security precautions and the purpose of the ring itself.

Using those keys, the ring members employed a two-step process in communicating with one another and posting child pornography. First, a member would upload scrambled and encrypted binary files of child pornography to a newsgroup location determined by Yardbird.[12] Each such file was posted under a specified subject line and attributed to the newsgroup nickname associated with the poster. The uploader would then text an encrypted message to another newsgroup in which the ring was active, advising of the upload, its location, and providing pertinent instructions. The recipient members could then download the encrypted message, decrypt and read it, and then follow the instructions contained therein to locate and download the files containing child pornography. The ring also employed other means of avoiding detection, like masking their headings when posting messages or files,[13] or changing the nicknames by which they were known to each other.[14]

---

[12] These locations were selected by Yardbird with the assistance of the ring members, and were chosen because of their innocuous nature. Examples of the newsgroups were ones involving cuisine and gardening.

[13] Members masked their post headings either through the use of a remailer or an anonymizer, both of which served to strip any identifying information from the message and prevent identification of the poster.

[14] With each rotating newsgroup, the defendants were told to invent a new nickname, which was intended to be the only nickname used by the defendants during the duration of the ring's involvement in that newsgroup. The ring

9

Ultimately, the international reach of the child pornography ring became apparent to Constable Power. An analysis of unmasked newsgroup posts in conjunction with information obtained from corresponding NSPs enabled Constable Power to determine just how far the ring reached: at its peak it had as many as 64 known members operating in at least six different countries. Therefore, in August 2006, Constable Power came to the United States, where he continued his investigation in conjunction with the Federal Bureau of Investigation's Innocent Images Unit. The joint investigation continued for over one year. During that time, law enforcement identified 22 members of the child pornography ring, fourteen of whom became people of special interest. In all, the joint investigation detected the upload by ring members of over 400,000 images and more than 1,000 videos from August 31, 2006 through December 15, 2007.[15] Although not all of those images and videos portrayed child pornography, many depicted the sexual abuse of minors in graphic and grotesque detail.

members were discouraged from referring to each other by their former nicknames, as it was believed such references would permit law enforcement to make individual identifications. Nonetheless, each ring member was provided with an encrypted list, which contained the nicknames by which each member had been previously known. In most instances, the defendants here had each created in excess of five nicknames.

[15] Constable Power downloaded many of the binary and text postings of the pornography ring, saving them onto two external hard drives.

*Arrest of Members of Child Pornography Ring*

On or about February 28, 2008, law enforcement agents simultaneously executed search warrants at the defendants' respective residences. Each search warrant was carried out with alacrity with but one exception: when agents sought to execute the warrant for Daniel Castleman by "knocking and announcing," he ignored their request for approximately thirty minutes. When they finally gained entrance to Castleman's home with the assistance of a locksmith, law enforcement agents found him in his living room, running a destructive "wipe" program on his computer. All the defendants except Castleman confessed their involvement with child pornography and with the child pornography sharing ring in question.[16] PGP encryption keys of the type used by Constable Power to access the pertinent newsgroup postings were found in possession of every defendant except Neville McGarity.[17] After being taken into custody and being incarcerated together, six of

---

[16] None of the defendants' confessions were recorded.

[17] It should be noted that, soon after the search warrants were executed, Yardbird posted an agreed-upon code-phrase in the ring's newsgroup to warn the members of law enforcement actions. None of the "core" ring members were arrested by American authorities, although one member, Christopher Stubbings a/k/a "Helen," was later identified and successfully prosecuted in England.

11

the seven also admitted to one another their membership in the child pornography ring.[18]

**B.**

On February 21, 2008, a Northern District of Florida grand jury indicted twelve defendants on 35 counts of child-related offenses. Almost one month later, the Government filed a Superseding Indictment against fourteen defendants, including the original twelve first named, now alleging 40 counts of criminal offenses related to child pornography.

At trial, after being presented with the evidence detailed above, a jury found the defendants guilty of various child pornography-related offenses, as noted above. Each of the defendants was sentenced to life imprisonment for engaging in a CEE, as well as other sentences based upon their specific convictions. This appeal ensued.

**II.**

Various standards of review apply to the amalgamated issues raised on this consolidated appeal. We review de novo the constitutionality of a statute. United States v. Spoerke, 568 F.3d 1236, 1244 (11th Cir. 2009). A district court's

---

[18] John Mosman, a defendant in Wayerski, testified at trial that all defendants but Castleman admitted their membership in the child pornography ring, as well as identified certain information relevant to their membership therein.

12

determination regarding sufficiency of the indictment is a question of law subject to de novo review. See United States v. Pendergraft, 297 F.3d 1198, 1204 (11th Cir. 2002). However, we review a district court's evidentiary ruling for abuse of discretion. See United States v. Langford, 647 F.3d 1309, 1319 (11th Cir. 2011) (citation omitted). "A challenge to a jury instruction presents a question of law subject to de novo review." United States v. Ndiaye, 434 F.3d 1270, 1280 (11th Cir. 2006). While a district court has "broad discretion in formulating its charge as long as the charge accurately reflects the law and the facts," Spoerke, 568 F.3d at 1244 (quotation marks omitted), we review for abuse of discretion a district court's refusal to give a jury instruction. See United States v. Puche, 350 F.3d 1137, 1150 (11th Cir. 2003). Whether the evidence is sufficient to sustain a defendant's conviction is a question of law, which we review de novo. United States v. To, 144 F.3d 737, 743 (11th Cir. 1998). The denial of a motion for a mistrial is reviewed for abuse of discretion. United States v. Campa, 529 F.3d 980, 992 (11th Cir. 2008). Allegations of prosecutorial misconduct present mixed questions of fact and law that are reviewed de novo. United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997).

A district court's determination of facts that support enhancements under the Sentencing Guidelines are findings of fact subject to the clearly erroneous

13

standard. See United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002). The application of the Sentencing Guidelines to the facts as found by the district court is a question of law that we review de novo. See United States v. Yates, 990 F.2d 1179, 1182 (11th Cir. 1993). A district court's findings of fact for determining a base offense level are subject to the clearly erroneous standard of review. See United States v. Kummer, 89 F.3d 1536, 1544 (11th Cir. 1996). Whether a particular guideline applies to a given set of facts is a question of law subject to de novo review. See United States v. Kirkland, 985 F.2d 535, 537 (11th Cir. 1993). When a defendant fails to object to a decision by the lower court, the issue is reviewed for plain error. See United States v. Mitchell, 146 F.3d 1338, 1342 (11th Cir. 1998). Otherwise, we review the issue de novo. United States v. Ferreira, 275 F.3d 1020, 1024 (11th Cir. 2001).

Now, we turn to the errors alleged by the defendants.

### III.

All of the defendants challenge the constitutionality of the CEE statute, 18 U.S.C. § 2252A(g), on grounds that the statute is unconstitutionally vague and overbroad.[19] Section 2252A(g) states, in relevant part:

---

[19] The defendants argue these issues are mutually exclusive, to which the Government responds in kind. However, within the particular circumstances of this case, we find that the defendants' arguments in this regard are properly

14

> A person engages in a child exploitation enterprise . . . if the person violates section 1591, section 1201 if the victim is a minor, or chapter 109A (involving a minor victim), 110 (except for sections 2257 and 2257A), or 117 (involving a <u>minor victim</u>), <u>as a part of a series</u> of felony violations constituting <u>three or more separate incidents</u> and involving more than one victim, and commits those offenses <u>in concert with three or more other persons</u>.

18 U.S.C. § 2252A(g)(2) (emphasis added).

The defendants contend that the statute is unconstitutionally vague and overbroad because 1) the term "series" is ambiguous and lacks definition; 2) the phrase "three or more separate incidents" is ambiguous as to whether each incident must involve "more than one victim"; and 3) the statute does not specify whether the same three individuals must be involved in each of the predicate felonious incidents.

Our precedent in <u>Wayerski</u> forecloses the defendants' vagueness claims. In <u>Wayerski</u>, four members of the same child pornography-sharing ring in question here were convicted for similar offenses, including engaging in a CEE, in

---

considered only under the rubric of vagueness, as the overbreadth doctrine is reliant on a First Amendment analytical framework wholly inapplicable here. <u>See, e.g.</u>, <u>United States v. Dean</u>, 635 F.3d 1200, 1204 (11th Cir. 2011) (applying overbreadth doctrine to consideration of whether a statute criminalizing child pornography chilled speech is protected by the First Amendment).

violation of § 2252A(g).[20] Wayerski, 624 F.3d at 1346. The Wayerski defendants argued that § 2252A(g) was unconstitutionally vague because the statute did not clarify how a "series of felony violations constituting three or more separate incidents" may occur, id. at 1347-48, and thus did not "provide fair notice of what conduct it proscribes," id. at 1347.

Our Court rejected those contentions, explaining that "[n]othing about § 2252A(g) is vague when applied in the context of the defendants' actions." Id. at 1348. Specifically, we noted in Wayerski:

Section 2252A(g) defines the predicate offenses that must be committed. The defendants' activity here satisfied the predicate offenses . . . . The offenses involved much more than three separate instances and more than one victim, and they occurred in concert with more than three people.

Id. Accordingly, we rejected the defendants' vagueness challenge because "[o]ne to whose conduct a statute clearly applies may not successfully challenge it [facially] for vagueness." Id. (quoting Bama Tomato Co. v. U.S. Dep't of Agric., 112 F.3d 1542, 1547 (11th Cir. 1997)) (alteration in original).

---

[20] The Wayerski defendants' predicate offenses were similar to those of the defendants in this case. All four of the Wayerski defendants were convicted of advertising child pornography, in violation of 18 U.S.C. § 2251(d)(1), and two of the Wayerski defendants were convicted of transporting or shipping child pornography, in violation of 18 U.S.C. § 2252A(a)(1), and receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2).

16

Identical reasoning applies here. The defendants participated in the same child pornography ring as the Wayerski defendants. And like the Wayerski defendants, the CEE predicate offenses for which the defendants here were convicted all fall within Chapter 110 of Title 18 of the U.S. Code and are thus specifically identified as predicate offenses in the text of § 2252A(g).

Moreover, like the Wayerski defendants' crimes, the defendants' crimes here "involved much more than three separate instances and more than one victim, and they occurred in concert with more than three people." Wayerski, 624 F.3d at 1348. As we explained in Wayerski:

> [T]he defendants participated in a sophisticated group of approximately 45 individuals who advertised and exchanged over the Internet thousands of images and videos of child pornography involving numerous minor children . . . . During the course of the group's existence over 400,000 images and videos . . . were advertised, transported, and/or received by its members.

Id. The defendants' actions clearly fall within the intended reach of the CEE statute, so their complaints of vagueness are unavailing. Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982) ("A [defendant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.").

Even assuming, arguendo, that the defendants could facially attack the statute for vagueness, the Wayerski Court rejected this exact claim. In Wayerski, we concluded that § 2252A(g) survived a facial vagueness challenge because it was "clear what the [statute] as a whole prohibits." Wayerski, 624 F.3d at 1349 (quotation marks and citation omitted). Specifically, we explained that it is clear to a person of ordinary intelligence that § 2252A(g)'s plain language prohibits "the commission of specified child pornography offenses that occur as a series of three or more separate instances, involving two or more victims, and three or more persons acting in concert with the defendant." Id. at 1349; see United States v. Williams, 553 U.S. 285, 304 (2008) (explaining that a criminal statute is void for vagueness where it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement").

In this regard, we add to Wayerski's reasoning the fact that § 2252A(g)'s plain language 1) does not legislate new offenses, but instead relies on established offenses as predicates; and 2) facially limits almost entirely those predicates to offenses involving a minor, with only two of the specified sections not being so delimited: § 1591 and chapter 110. See 18 U.S.C. § 2252A(g)(2).

18

Nonetheless, both § 1591 and chapter 110 also criminalize sexual offenses against children. Section 1591 is entitled "Sex trafficking of children or by force, fraud, or coercion." 18 U.S.C. § 1591. By its terms, it prohibits anyone from:

> recruit[ing], entic[ing], harbor[ing], transport[ing], provid[ing], obtain[ing], or maintain[ing] by any means a person . . . [for the purpose of causing] the person to engage in a commercial sex act, <u>or that the person has not attained the age of 18 years</u> and will be caused to engage in a commercial sex act . . . .

<u>Id.</u> § 1591(a)(1)–(2) (emphasis added). Likewise, chapter 110 is entitled "Sexual Exploitation and Other Abuses of Children," and criminalizes activity relating to the "selling or buying of children," 18 U.S.C. § 2251A, sexual exploitation of minors, <u>id.</u> § 2252, and other similar offenses. <u>See, e.g.</u>, <u>id.</u> §§ 2251, 2260. Thus, the main thrust of both § 1591 and chapter 110 is to prevent harm to minors. <u>Cf.</u> <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 110–11 (1972) (holding antinoise ordinance in question was not impermissibly vague where "it is clear what the ordinance as a whole prohibits . . .").

We recognize that defendants posit certain hypotheticals that they argue demonstrate the vagueness of the CEE statute. So, for instance, § 2252B(a) within chapter 110 prescribes a criminal offense punishable by up to two years in prison for using a misleading domain name with the intent to deceive a person into

19

viewing obscenity. Section 2252B(a) does not require that either the person deceived or the material viewed must involve a minor. Id. Assuming there were three such offenses otherwise meeting the requirements of § 2252A(g), an individual could be prosecuted for engaging in a CEE, regardless of whether any minors were involved in any of the three predicate offenses. To the defendants, this statutory uncertainty "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." We disagree.

Even if there may be some instances in which certain crimes could be swept into a CEE violation, the only predicates under the CEE statute are nonetheless criminal statutes found elsewhere in the United States Code and there can be no doubt that the CEE statute properly notifies average citizens of what is prohibited, and limits any arbitrary enforcement. Accordingly, the defendants' purportedly absurd constructions of § 2252A(g) do not require us to invalidate the statute wholesale. Wayerski, 624 F.3d at 1349 ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.") (quotation marks and citation omitted).

**IV.**

Next, some of the defendants, whom we identify below with specificity, challenge the sufficiency of the Superseding Indictment in regards to two counts: Count One, which charged a violation of the CEE statute under 18 U.S.C. § 2252A(g); and Count Forty, which charged statutory obstruction of justice under 18 U.S.C. § 1512(c).

When analyzing such challenges, we "give the indictment a common sense construction, and its validity is to be determined by practical, not technical, considerations." United States v. Poirier, 321 F.3d 1024, 1029 (11th Cir. 2003) (quotation marks and citations omitted). Such a common sense construction is satisfied through consideration of three factors: whether the indictment "1) presents the essential elements of the charged offense, 2) notifies the accused of the charges to be defended against, and 3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." United States v. Woodruff, 296 F.3d 1041, 1046 (11th Cir. 2002) (quotation marks and citations omitted). These factors ensure the provision of constitutional notice and due process. United States v. Fern, 155 F.3d 1318, 1325 (11th Cir. 1998); see also United States v. Yonn, 702

F.2d 1341, 1348 (11th Cir. 1983) ("To pass constitutional muster, an indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecutions for the same offense."). Ultimately, "the appropriate test . . . is not whether the indictment might have been drafted with more clarity, but whether it conforms to minimal constitutional standards." United States v. Varkonyi, 645 F.2d 453, 456 (5th Cir. 1981).[21] However, "[e]ven when an indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." United States v. Schmitz, 634 F.3d 1247, 1261 (11th Cir. 2011) (quotation marks and citations omitted).

## A.

After unsuccessfully challenging the sufficiency of the Superseding Indictment as to Count One prior to trial, Castleman, Lakey, Mumpower, Lambert, and McGarity again argue that Count One is insufficient as a matter of law for two reasons: 1) it fails to allege that the defendants acted "in concert with three or

_____

[21] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding all Fifth Circuit precedent prior to October 1, 1981. Varkonyi was decided on May 20, 1981, and is therefore binding.

more persons"; and 2) it is "hopelessly vague" and "provide[s] no detail" regarding the three predicate offenses under § 2252A(g).

Count One of the Superseding Indictment alleges as follows:

> [O]n or about August 31, 2006, through the date of the return of this superseding indictment, in the Northern District of Florida and elsewhere, the defendants . . . did knowingly and willfully engage in a child exploitation enterprise, that is, the advertisement, transportation and shipment of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), in interstate and foreign commerce by means of a computer, as a series of three or more separate incidents and involving more than one victim, in violation of Title 18, United States Code, Section 2252A(g).

We examined this same indictment in Wayerski and concluded that Count One "was plainly sufficient" because it "provided a general description of the facts and predicate offenses" relevant to the CEE charge, specifically, that the defendants advertised, transported, and shipped child pornography. Wayerski, 624 F.3d at 1350. In addition, we found this indictment sufficient as to Count One because it "tracked the language of the statute on which it was based, i.e. § 2252A(g), and provided notice to the defendants of the charges to be defended." Id.; see United States v. Fern, 155 F.3d 1318, 1325 (11th Cir. 1998) ("If an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the

charge."). We are bound by our precedent in <u>Wayerski</u> and therefore hold that Count One of the indictment sufficiently alleged a violation of § 2252A(g).

Even were we not bound by our decision in <u>Wayerski</u>, we would reach the same conclusion. The defendants' arguments that the indictment did not sufficiently allege a CEE offense are unavailing. In support of their challenge, the defendants cite <u>United States v. Gayle</u> for the contention that a conviction will be overturned where "the indictment upon which it is based does not set forth the essential elements of the offense." 967 F.2d 483, 485 (11th Cir. 1992) (<u>en banc</u>) (citation omitted). But <u>Gayle</u> did not require that an indictment specify each element of an offense with particularity. Rather, <u>Gayle</u> evidences our refusal to require such specificity in certain contexts. In <u>Gayle</u>, two men were arrested for impersonating a federal officer and acting as such, in violation of 18 U.S.C. § 912. After conviction, they appealed, contending that the underlying indictment was insufficient because 1) it "failed to allege that the defendants acted with an 'intent to defraud' and consequently did not set forth an essential element of the offense"; and 2) it "fail[ed] to allege that defendants engaged in overt acts beyond the mere impersonation of a federal officer." <u>Id.</u> at 485, 487. Sitting <u>en</u> <u>banc</u>, we rejected both bases for appeal, holding that the indictment in question sufficiently alleged

24

the relevant elements of a § 912 violation. The linchpin of our holding was that the indictment provided sufficient notice of the allegations against the Gayle defendants.

Here, Count One satisfies that same requirement. It alleges knowing and willful involvement in a child exploitation enterprise, which § 2252A(g)(2) defines as a violation of certain sections and chapters of the United States Code, "as a part of a series of felony violations constituting three or more separate incidents and involving more than one victim." Id. The fact that Count One does not specifically state that the defendants acted "in concert with three or more persons" does not render the indictment insufficient; the indictment's explicit reference to § 2252A(g) put the defendants on notice as to all of the elements of the CEE offense, including the "in concert" requirement. See Poirier, 321 F.3d at 1029 ("Minor deficiencies that do not prejudice the defendant will not prompt this Court to reverse a conviction.") (citation omitted). Given that the sufficiency of a charge must be given "a common sense construction," id., we have no difficulty here finding Count One sufficient as charged. Just as in Gayle, where an "intent to defraud" was presumed from a charge for impersonation of a federal officer, so,

too, is acting "in concert with three or more persons" presumed from a charge of engaging in a child exploitation enterprise that explicitly refers to § 2252A(g).

As to the defendants' contention that each predicate offense for a child exploitation enterprise must be pled with specificity in an indictment, we note that we have previously rejected such a claim in a similar context. See United States v. Alvarez-Moreno, 874 F.2d 1402, 1408-11 (11th Cir. 1989) (holding predicate offenses for a continuing criminal enterprise prosecution need not be charged in an indictment); United States v. Valencia-Trujillo, 573 F.3d 1171, 1181 (11th Cir. 2009) (approving Alvarez-Moreno).[22]

In Alvarez-Moreno, we considered whether uncharged criminal offenses could serve as predicate offenses for a prosecution under 21 U.S.C. § 848, which prohibits engaging in a continuing criminal enterprise ("CCE"). There, the question arose in the context of a massive drug conspiracy that involved a Colombian defendant, Carlos Alvarez-Moreno, who was extradited to the United States. At trial, Alvarez-Moreno was convicted of, among other crimes, engaging

---

[22] Nor are we alone in that finding. See, e.g., United States v. Young, 745 F.2d 733, 747 (2d Cir. 1984); United States v. Markowski, 772 F.2d 358, 361-62 (7th Cir. 1985); United States v. Becton, 751 F.2d 250, 256 (8th Cir. 1984) (same); United States v. Sterling, 742 F.2d 521, 526 (9th Cir. 1984) (same).

in a CCE within the meaning of 21 U.S.C. § 848. Id. at 1407. On appeal, Alvarez-Moreno argued that each predicate violation for a CCE offense should have been charged in the indictment.

Reviewing relevant, contemporaneous case law, we rejected that contention and held that predicate offenses "need not be charged or even set forth as predicate acts in the indictment." Id. at 1408 (citation omitted). Instead, "[t]he law only requires evidence that the defendant committed three substantive offenses to provide the predicate for a section 848 violation, regardless of whether such offenses were charged in counts of the indictment . . . ." Id. at 1408-09.

We see no reason to vary from this holding for a conviction under 18 U.S.C. § 2252A(g), which the parties (and at least one of our sister circuits) agree should be interpreted similarly to § 848. See United States v. Daniels, 653 F.3d 399, 412 (6th Cir. 2011) ("Given the similar language [in the two statutes] we believe that interpretations of § 848 should guide our interpretation of § 2252A(g)."). Accordingly, we hold that, in a CEE indictment, predicate offenses under 18 U.S.C. § 2252A(g) need not be identified with specificity. We therefore reject the defendants' challenges to the sufficiency of Count One as charged in the Superseding Indictment.

**B.**

All of the defendants also challenge the sufficiency of the Superseding

Indictment with regard to Count Forty,[23] which charged them with statutory

obstruction of justice, in violation of 18 U.S.C. § 1512(c). Prior to trial, they

moved for dismissal on the same basis, which was denied. Citing a ruling by the

First Circuit in United States v. Murphy, 762 F.2d 1151 (1st Cir. 1985), the

defendants allege error. They contend that an indictment charging a defendant

with statutory obstruction of justice under § 1512(c) must identify which official

---

[23] All the defendants but White raised the issue in their briefs, or adopted the arguments of their co-defendants in this regard. While White's failure to do the same could be construed as an abandonment of the claim, United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (finding defendant had abandoned basis for appeal when he failed to raise the issue), we find no such abandonment here. See United States v. Gray, 626 F.2d 494, 497 (5th Cir. 1980). In Gray, the former Fifth Circuit held:

> On appeal, only Wright followed Fed.R.App.P. 28(I) and adopted his codefendants' arguments by reference in his brief. The other defendants waited until oral argument to adopt their codefendants' contentions. Ordinarily we would limit each defendant's appeal to the issues raised in his brief. However, we have discretion to suspend the Federal Rules of Appellate Procedure "for good cause shown," Fed.R.App.P. 2. Believing it anomalous to reverse some convictions and not others when all defendants suffer from the same error, we consider the arguments to be adopted . . . . This adoption does not prejudice the government which had the opportunity to fully brief all issues in response to the various contentions of the defendants.

proceeding was obstructed and otherwise provide sufficient notice to the

defendant of the factual predicate for the charge. Given the nature of the charge

against the defendants, we must agree.

First, we consider the relevant language within the Superseding Indictment.

In relevant part, Count Forty alleges as follows:

> That between on or about October 1, 2005, through the date of the return of this [S]uperseding [I]ndictment, in the Northern District of Florida and elsewhere, the defendants . . . did corruptly obstruct, influence and impede and attempt to corruptly obstruct, influence and impede the due administration of justice in an official proceeding, in violation of Title 18, United States Code, Section 1512(c)(2).

By its terms, Count Forty tracks the relevant portions of § 1512(c).[24] Nonetheless,

the defendants rely upon Murphy in arguing that some factual notice is required in

charging obstruction of justice under the statute.

---

[24] 18 U.S.C. 1512(c) provides that
> Whoever corruptly—
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>> shall be fined under this title or imprisoned not more than 20 years, or both.

In Murphy, the First Circuit considered whether an indictment must specify which official proceedings were allegedly obstructed by a defendant. There, a man named Richard Watson was a drug informant for local, state, and federal law enforcement agencies. 762 F.2d at 1152. In the course of his role as an informant, Watson introduced many people to an undercover state police officer, as well as purchased cocaine in his informant capacity from a man named Haythem Dawlett. Dawlett was subsequently arrested on federal charges of distributing cocaine. Separately, several other individuals acquainted with Watson—Patrick Murphy, Kevin Deyo, and Steven Quinlivan—were also the subject of another DEA investigation being conducted in the same locale. Id. Those individuals were eventually charged and indicted. They appeared at the Springfield federal courthouse for their arraignment at 10 a.m. on the day in question. Unfortunately, that same day Watson also had a meeting around the same time at the Springfield federal courthouse, where he was supposed to meet with his DEA handler. As he approached the courthouse, Watson spotted Murphy, Deyo, and Quinlivan exiting. Watson, believing they had identified him, turned and headed back in the direction from whence he had come. He testified that Murphy, Deyo, and Quinlivan followed him and threatened bodily harm, presumably because of his role as an

30

informant. Id. at 1153. The Government subsequently filed a one-count indictment

against Murphy, Deyo, and Quinlivan for violation of 18 U.S.C. § 1512(c). In its

indictment, the Government "parroted the statute" and identified only the date the

offense occurred, without identifying which official proceeding the defendants

obstructed. The defendants were found guilty.

Reversing the conviction, the First Circuit stated as follows:

The indictment in the instant case did not identify *any* proceeding in
which defendants were allegedly attempting to influence Watson's
testimony. It is wholly unclear from the indictment whether the grand
jury was charging that defendants tried to influence Watson's
testimony in the proceeding against Dawlett, or in the proceeding
against them, or in some other proceeding altogether. Crucial to
preparation of any defense to a charge under the statute is at least
some indication of the identity of the proceeding in which the
defendant tried to influence testimony. The indictment at issue here
presented no such indication . . . .

Id. at 1154 (emphasis in original). Therefore, finding that "the indictment was

defective because it did not adequately apprise the defendants of the charges

against them," the First Circuit vacated the conviction and remanded with

instructions to dismiss the underlying indictment. Id. at 1155.

In the instant case, the Government concedes that Count Forty does not

specify which official proceeding was obstructed. It argues such vagueness is

31

necessary, however, because of the nature of the defendants' obstruction, which sought to impede "any possible proceeding that might exist." It further urges that we have upheld similar charges in other indictments. See United States v. Bascaro, 742 F.2d 1335, 1348-49 (11th Cir. 1984) (upholding indictment that charged criminal conduct by specifying defendants involved and relevant time span, among other factors), abrogated on other grounds by United States v. Lewis, 492 F.3d 1219 (11th Cir. 2007); Ndiaye, 434 F.3d at 1299.[25]

Without addressing either Bascaro or Ndiaye, both of which are distinguishable, we note that the Government has not cited any Eleventh Circuit law—nor have we found any upon independent review—that would permit an indictment charging a violation of § 1512(c) under these circumstances. Although Murphy is of course not binding on us, we similarly recognize that an indictment must "sufficiently apprise [] the defendant[s] of what [charges they] must be prepared to meet." Murphy, 762 F.2d at 1154 (alterations in original) (quoting

---

[25] We note that we have refined our reasoning since Bascaro. See, e.g., United States v. Bobo, 344 F.3d 1076, 1083 (11th Cir. 2003) (Even when an indictment "tracks the language of the statute, 'it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.'") (citing Russell v. United States, 369 U.S. 749, 765 (1962)); Schmitz, 634 F.3d at 1261 (same).

32

Russell, 369 U.S. at 763). Even under a "common sense construction" of an indictment charge, Poirier, 321 F.3d at 1029, the only notice provided here is that the defendants obstructed an unknown official proceeding at some time in some place by some action.

This lack of notice does not satisfy Woodruff. Although Count Forty tracks the statutory language of § 1512(c) and therefore satisfies the first consideration, it wholly fails to satisfy either the second or third Woodruff factor. Without some factual predicate anchoring Count Forty's charge, the Superseding Indictment provides insufficient constitutional notice, both as to what charges must be defended against and as to the possibility of future prosecutions on the same basis. Without some indication of either, the Superseding Indictment cannot be said to "notif[y] the accused of the charges to be defended against." Woodruff, 296 F.3d at 1046.

Although we will not upset a conviction for "minor deficiencies," Poirier, 321 F.3d at 1029 (quotation marks omitted), these deficiencies cannot be considered minor. As a result, we must vacate all of the defendants' convictions thereunder.

**V.**

33

Certain defendants also allege error regarding certain rulings both prior to trial and during trial. We consider these alleged errors in turn.

**A.**

First, McGarity, Castleman, Lakey, Lambert, Freeman, and Mumpower contend that the district court erred in permitting Warren Weber, a co-defendant, to testify regarding their failure to proclaim their innocence while incarcerated together following their arrests.[26] At trial, the jury heard the following inquiry of Weber by the prosecutor:

| | |
|---|---|
| Prosecutor: | Please tell the ladies and gentlemen of the jury which one of these defendants, when charged with a child exploitation enterprise, while locked up, said, "Oh my God, it's not me I didn't do any of this. . . ." Which ones denied it? |
| Weber: | No one actually ever said that they were innocent. We never discussed that, no. |
| Prosecutor: | No one stood up and said, I didn't do this? |
| Weber: | No, sir.[27] |

---

[26] Weber was a cooperating defendant and, in addition to co-defendant Ruble Keys, testified regarding the child pornography ring's efforts at avoiding detection by law enforcement.

[27] For the sake of continuity in conveying Weber's testimony, we have omitted the objections interspersed therein.

Contending that the prosecutor's inquiry improperly solicited comment on the defendants' right to remain silent, the defendants objected during and after the Government's inquiry. The objections were overruled. After the Government rested, the defendants moved for a mistrial on the same basis. The district court denied the motion with the statement that the defense can "tell them in [their] argument." Now, the defendants again allege error.

A prosecutor impermissibly comments on a defendant's right to remain silent where: "(1) the statement was <u>manifestly intended</u> to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." <u>United States v. Knowles</u>, 66 F.3d 1146, 1162-63 (11th Cir. 1995) (quotation marks and citation omitted) (emphasis in original). "[T]he question is not whether the jury possibly or even probably would review the remark in this manner, but whether the jury <u>necessarily</u> would have done so." <u>United States v. Swindall</u>, 971 F.2d 1531, 1552 (11th Cir. 1992) (quotation marks and citation omitted) (emphasis in original).

Although the Government concedes that "elicit[ing] testimony or argu[ing] to the jury that a defendant's decision not to testify is evidence of his guilt" is

improper, citing Griffin v. California, 380 U.S. 609, 609-15 (1965), here it argues

that the context of the comment made it innocuous and that there was an equally

plausible explanation for the remark. United States v. Calderon, 127 F.3d 1314,

1338 (11th Cir. 1997). In the Government's view, Weber's earlier testimony had

touched upon the child pornography ring's operations and attempts at avoiding

law enforcement. On cross-examination, the defense elicited testimony that Weber

"only knew other group members by their nicknames and did not personally know

other group members." So, the Government's argument goes, the testimony in

question was not elicited to comment on the defendants' refusal to testify or

decision to remain silent, but rather to demonstrate membership within the child

pornography group.

Although Weber's testimony related to the defendants' failure to proclaim

their innocence outside of court rather than commenting on their failure to

testify,[28] we nonetheless find the Government's explanation troubling. Even with

---

[28] The Government cites case law holding that the Fifth Amendment right to remain silent is not implicated in the context of inculpatory statements made by defendants to co-defendants or cellmates. See, e.g., Illinois v. Perkins, 496 U.S. 292, 296-97 (1990) ("Conversations between suspects and undercover do not implicate the concerns underlying Miranda."); United States v. Stubbs, 944 F.2d 828, 832 (11th Cir. 1991) ("Miranda and Fifth Amendment concerns are not implicated when a defendant misplaces her trust in a cellmate who then relays the

the additional context in which the Government places Weber's testimony, it is unclear how such testimony could have supported an inference of group membership. Instead, the relevant portion of Weber's testimony was pertinent only to the defendants' failure to protest their innocence in jail. The inescapable conclusion is therefore that the prosecutor's line of questioning was intended to elicit exactly the information that it did.

However, we need not resolve this issue because any such error did not constitute prejudicial harm. Where error can be remedied by subsequent instruction by the trial court or mitigated by the overwhelming weight of the evidence, it may be considered harmless so long as it does not affect the "substantial rights of the parties." See United States v. Dulcio, 441 F.3d 1269, 1275 (11th Cir. 2006) (quoting United States v. Cameron, 907 F.2d 1051, 1059 (11th Cir. 1990) (holding that "error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties")). This principle applies here. Any error in admitting Weber's testimony was overridden by both

information—whether voluntarily or by prearrangement—to law enforcement officials."). The defendants argue that those circumstances are materially different from these, where the testimony did not concern any affirmative, inculpatory statements made by defendants, but rather permitted inference of guilt on the basis of the defendants' silence to a cellmate.

the overwhelming evidence of the defendants' guilt, and by the court's subsequent jury instructions. See United States v. Turner, 871 F.2d 1574, 1582 (11th Cir. 1989) (detailing factors to be considered in assessing existence of harmless error).

As to the former, the Government produced overwhelming evidence of the defendants' guilt. Numerous witnesses, including Constable Power and various FBI special agents, testified regarding the types of child pornography shared amongst the defendants over the course of the investigation. Most newsgroup posts—both text and binary—were saved by Constable Power to his hard drive, processed by the FBI, and admitted into evidence at trial. The binary posts admitted into evidence contained thousands of images and videos of abhorrent child pornography, posted on request and cavalierly bandied back and forth between the defendants. Similarly, the text posts demonstrated not only knowledge of the nature of the videos and images being shared, but also an utter disregard for the health or welfare of the children being abused and exploited in the pornography being shared.

The Government also introduced supporting records, which traced the ownership and control of the NSP accounts used to access the newsgroups utilized by the far-flung child pornography ring. Payment records, credit card invoices, IP

addresses, proof of service by the respective internet providers, computer drives, and other hard evidence found at each defendant's residence all confirmed the defendants' involvement. Moreover, PGP encryption keys, nickname spreadsheets detailing the various nicknames used by each group member in each newsgroup, and the like literally littered the defendants' homes. On top of that evidence, all but one defendant confessed to his involvement, informing law enforcement of his respective screennames, the types of pornography in which he traded, and the lengths to which the ring members went to avoid detection. Given such voluminous evidence of guilt and combined with the defendants' own admissions, the Government's solicitation of Weber's testimony must be considered harmless. See, e.g., United States v. Cano, 289 F.3d 1354, 1360-64 (11th Cir. 2002) (concluding admission of testimony was harmless error because of other overwhelming evidence of guilt).

The district judge's instructions also militate against finding prejudicial error here. He instructed the jurors to consider the totality of the evidence and, if appropriate, to base their findings of the defendants' guilt upon "proof of such a convincing character that [the jurors] would be willing to rely and act upon it without hesitation in the most important of your affairs." More pointedly, he

39

emphasized that the testimony of such witnesses as Weber "must be considered with more caution than the testimony of other witnesses." The district judge's instruction regarding the caution with which Weber's testimony must be treated was further strengthened by another warning that any testimony regarding "statements or admissions to someone after being arrested or detained . . . [must be considered] with caution and great care." In addition, the district court expressly instructed the jury that the defendants' failure to testify could not be used as evidence of guilt. The cumulative effect of these instructions was to limit the impact of testimony such as Weber's upon the jury's findings.

Accordingly, both on the basis of the overwhelming evidence of the defendants' guilt and the district court's jury instructions, any alleged error resulting from the prosecutor's improper solicitation of testimony was harmless.

**B.**

Next, McGarity contends that a typed statement he had made prior to trial was improperly admitted at trial. He had provided the typed statement on or about February 28, 2008, when law enforcement agents arrived at his house with a search warrant. In the statement, McGarity detailed his sexual attraction to children between ages two and five, his failures in resisting those attractions, and

40

his prior fondling, touching, and molestation of his two-year-old daughter some nine years earlier (although he also said that he had "never once . . . penetrate[d] her, hurt her or demean[ed] her in any way whatsoever . . . ."). When the Government sought to admit his statement and publish it to the jury, McGarity objected that it was inadmissible pursuant to Federal Rules of Evidence 403 and 404(b) because of the "overwhelming evidence of guilt." The district court overruled that objection, but nonetheless issued a limiting jury instruction. Now, McGarity alleges error in the admission of his statement.[29]

McGarity relies upon a former Fifth Circuit case, United States v. San Martin, 505 F.2d 918 (5th Cir. 1974), which he contends set the threshold requirements for admission of prior criminal acts. In San Martin, the Fifth Circuit

---

[29] It must be noted that McGarity argues, as he did at trial, that such evidence should not be admitted "given the volume and character of the evidence [otherwise] admitted," rather than disputing the underlying relevance. Thus, this Court need only decide whether the district court balanced the necessary factors under Rule 404(b).
    FBI Agent Rex Miller read to the jury McGarity's written confession. The district court did not err in admitting evidence of over 50,000 digital images and videos of child pornography seized from McGarity's residence. McGarity did not object at trial and has not shown plain error on appeal. This 404(b) evidence showed that McGarity, due to his possession of a large quantity of child pornography, intended to acquire and distribute child pornography with his co-defendants.

considered whether evidence of prior criminal acts for resisting or opposing a police officer could be used at trial for a similar crime. In disallowing the evidence at issue, the court noted several prerequisites to the admission of any such evidence:

1. Proof of the prior similar offenses must be "plain, clear and convincing";
2. The offenses must not be too remote in time to the alleged crime;
3. The element of the prior crime for which there is a recognized exception to the general rule, such as intent, must be a material issue in the instant case; [and]
4. There must be a substantial need for the probative value of the evidence provided for by the prior crimes.

Id. at 921-22. Here, McGarity argues that neither the third nor fourth prongs of the San Martin test were met.

While we recognize the factors laid out by the San Martin court, we find that those factors are now largely subsumed within a trial court's inquiry under the Federal Rules of Evidence. So, for instance, the Rules generally prohibit the admission of propensity evidence. See Fed.R.Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). Nonetheless, they provide a

42

specific exception for "child molestation" cases. Specifically, Federal Rule of

Evidence 414(a) provides:

> In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.[30]

The phrase "offense of child molestation" includes "any conduct proscribed by

chapter 110 of title 118, United States Code." Fed.R.Evid. 414(d)(2). Advertising,

transporting, and receiving visual depictions of child pornography, in violation of

18 U.S.C. § 2252(a)(4)(B), and receiving visual depictions of child pornography,

in violation of 18 U.S.C. §§ 2251(d), 2252A(a)(1) and 2252A(a)(2), are offenses

within chapter 110 of title 18.[31] It thus follows that McGarity's written confession

could be properly admitted against him, so long as its admission satisfied other

relevant Rules of Evidence.[32] Our primary concern is therefore whether the

---

[30] We note that Federal Rule of Evidence 414 was amended effective December 1, 2011. However, the amendment does not change the result of this inquiry, even if it were considered retroactive. Accordingly, we herein quote the pre-amendment language of Rule 414.

[31] Specifically, McGarity was convicted of child pornography offenses in Count Ten (advertising), Count Twenty-One (transporting), and Count Thirty-Three (receiving).

[32] Although we have not previously determined, in a published decision, whether such evidence must satisfy Rule 403, other circuits have so held. See, e.g.,

admission of McGarity's written confession was proper under Rule 403. We find that it was.

Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. To make such a determination, the context of both the evidence and its admission must be considered. United States v. Lopez, 649 F.3d 1222, 1247-48 (11th Cir. 2011) (considering context of admission of evidence under Rule 403 inquiry)

A review of the factual and procedural context at trial supports the district court's decision to admit the written statement, as it provided necessary context to the plethora of evidence introduced against McGarity by the Government. The weight of the evidence introduced against McGarity was substantial. For example, the Government presented the jury evidence of McGarity's screennames, which

United States v. Kelly, 510 F.3d 433, 437 n.3 (4th Cir. 2007) (affirming applicability of Rule 403, and noting other circuit holdings); United States v. Hawpetoss, 478 F.3d 820, 824 (7th Cir. 2007) (same); United States v. LeMay, 260 F.3d 1018, 1026-27 (9th Cir. 2001) (same); United States v. Castillo, 140 F.3d 874, 882-83 (10th Cir. 1998) (same). We also find that evidence admitted under Rule 414(a) must satisfy Rule 403.

he used in posting over 800 messages to the pornography ring,[33] as well his NSP identification, his NSP address, and his payment information for those services. Nonetheless, the nature of McGarity's crime was intended to avoid detection. It took a lengthy and expensive investigation to understand and to trace the type of activity in which McGarity participated. In such a context, we will not find improper the district court's admission of McGarity's written confession, where it could have been used not only to make the Government's case "believable but also understandable." Lopez, 649 F.3d at 1248. The fact that the district court considered McGarity's objections contemporaneously during a sidebar—as well as offering a limiting instruction to the jury—only further supports the court's decision to admit the written statement. As such, the admission of McGarity's written statement was not error.[34]

## C.

---

[33] McGarity only encrypted his communications to the child pornography ring, rather than masking them through an anonymizer or remailer, which made him easier to identify than some of his colleagues.

[34] Nor, even if the admission of the written statement were error, could it have had a "substantial influence on the outcome" of McGarity's trial, given the weight of the evidence against him. See United States v. Belfast, 611 F.3d 783, 816 (11th Cir. 2010); United States v. Phaknikone, 605 F.3d 1099, 1109 (11th Cir. 2010).

Defendants McGarity, Lakey, Lambert, White, and Mumpower also contend that a mistrial was warranted because of three allegedly improper prosecutorial arguments.[35] We find that only one of the defendants' challenges necessitates discussion.

During its closing argument, the Government argued as follows:

Prosecutor:  The market for it [child pornography] is sitting directly behind me. These children would not be raped –

Defense:  Objection, improper argument.

Court:  Sustained.

Prosecutor:  The victims in these videos and images, they're the children. They're our daughters and granddaughters, neighbors, friends. Sometimes at night when I'm sitting in my house and everyone is asleep and even the puppy is down, it's awfully quiet, I can't fall asleep, sometimes you can hear the crying.

Defense:  Objection, improper argument.

Court:  Sustained.

Prosecutor:  You saw it on the video. I don't have to state it. I can't protect all the kids. At some point when the evidence is there, which is overwhelmingly here, there needs to be a verdict as to the Defendants who amass all this stuff,

---

[35] As noted above, we find the defendants' first two arguments in this regard to be without merit and not warranting discussion. See supra note 6.

> who work together to get all this stuff, who write over and over again how much they enjoy all this stuff, how these kids being penetrated arouse them and they like it. The evidence is overwhelming. It's not complex. It's good old fashioned police work. Please return a verdict of guilt on all counts.

Notwithstanding that their objections were sustained, the defendants contend a curative instruction was required[36] but not issued.[37]

As noted above in Section V(A), supra, when we review an issue of prosecutorial misconduct, we must determine (1) whether the challenged comments were improper and (2) if so, whether they prejudiced the defendant's substantial rights. United States v. Paul, 175 F.3d 906, 909 (11th Cir. 1999). "A defendant's substantial rights are prejudicially affected when a reasonable

---

[36] See, e.g., United States v. Wilson, 149 F.3d 1298, 1302 (11th Cir. 1998) (overlooking improper prosecutorial comment in part because of curative instructions by the trial court); United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985) (holding issuance of three curative instructions was sufficient to cure damage arising from prejudicial comments made by prosecutor).

[37] Although a curative instruction was not given at the time the district court sustained the objection, the district court did instruct the jury at the start of the trial that "statements, arguments and questions by the attorneys are not evidence"; before closing arguments that "what attorneys say in their closing argument is not evidence"; and in the closing instruction that the jury "must consider only the evidence that has been admitted in the case," "anything the attorneys said is not evidence in this case," and "[w]hat the attorneys say is not binding upon you."

probability arises that, but for the remarks, the outcome of the trial would have been different." United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006); see also United States v. Bailey, 123 F.3d 1381, 1400 n.25 (11th Cir. 1997) ("For a prosecutor's closing argument to violate due process, the remarks must be improper and a reasonable probability must exist that, but for the offending remarks, the defendant would not have been convicted.") (quotation marks and citation omitted).We find that the first prong of our inquiry is satisfied, but that the second is not.

As to the first prong, by telling the jury that the victims of the child pornography are "our daughters and granddaughters, neighbors, friends," the prosecutor here crossed the line between "demarcating permissible oratorical flourish from impermissible comment." United States v. Kopituk, 690 F.2d 1289, 1342 (11th Cir. 1982). Here there is no doubt of the impropriety of the emotional appeal to the jurors to recognize that the victims depicted in the thousands of images and videos were the jurors' own "daughters and granddaughters" and that "you can hear the crying."[38]

---

[38] Cf. Grossman v. McDonough, 466 F.3d 1325, 1348 (11th Cir. 2006) (holding that, in habeas case discussing Golden Rule under Florida law, describing the circumstances of death and the physical pain and emotional terror of victim is

Nonetheless, the improper argument did not so prejudicially affect the defendants' rights that a different outcome might have been achieved in its absence. In determining the level of prejudice stemming from a prosecutor's comment, we examine that comment in the context of the entire trial and in light of any curative instruction. Wilson, 149 F.3d at 1301; see also United States v. Hernandez, 145 F.3d 1433, 1438 (11th Cir. 1998).

As listed above, the district court sustained objections to the offending prosecutorial statements and thrice provided curative instructions admonishing that the jury "must consider only the evidence that has been admitted in the case," "anything the attorneys said is not evidence in the case," and "[w]hat the attorneys say is not binding upon you." See Bailey, 123 F.3d at 1402 ("[A]ny possible prejudice to Bailey resulting from the prosecutor's closing argument was cured by

---

not a Golden Rule violation but is nonetheless plainly relevant to whether murder was heinous, atrocious, or cruel); Kopituk, 690 F.2d at 1342-43 (rejecting defendant's claim that prosecutor suggested jury had a personal stake in the outcome when prosecutor argued the jurors were "citizens of the community" and by their verdict should say "enough is enough," "help clean up Dodge Island," and "rid the ports" of certain people). "Appeals to the jury to act as the conscience of the community . . . are not per se impermissible," id., and do "not constitute a direct suggestion that the jury ha[s] a personal stake in the outcome of the case." Id. at 1342.

instructions from the district judge that the lawyers' arguments were not evidence and that the jury was to decide the case solely on the evidence presented at trial.").

As we have already noted, supra, the weight of the evidence against the defendants was overwhelming. We need not delineate that evidence again. Instead, we only reaffirm that the weight of the evidence here was so overwhelming that the impropriety of the prosecutor's argument could have had no bearing on the jury's determination. See Eckhardt, 466 F.3d at 947 (finding that prosecutorial statements, even if improper, were not so cumulative as to demonstrate substantial error, and also that weight of evidence would have led to conviction even in the absence of those statements). At a minimum, the defendants have not carried their burden to show a reasonable probability that but for the remarks, the outcome of the trial would have been different. Therefore, we deny the defendants' challenge on the basis of improper prosecutorial argument.

**D.**

The defendants also challenge the district court's failure to issue a "unanimity" instruction in regard to the CEE charge of the Superseding Indictment. All seven defendants were charged in Count One with violating the CEE statute. In relevant part, § 2252A(g) prohibits engaging in a "child

50

exploitation enterprise . . . as a part of a <u>series</u> of felony violations constituting <u>three or more separate incidents</u> . . . ." <u>Id.</u> (emphasis added). The jury subsequently convicted each defendant. Now, the defendants contend both that 1) the district court was required to instruct the jury that any determination of predicate acts under § 2252A(g) had to be unanimous; and 2) that failure to administer such an instruction constitutes substantial and prejudicial harm.

**1.**

In its response and at oral argument, the Government concedes that the district court was required to give a unanimity instruction. Notwithstanding this concession, we nonetheless analyze this requirement below because of its relevance to subsequent discussion.

The need for a unanimity instruction arises out of § 2252A(g)'s "series" requirement. During trial, some of the defendants requested a unanimity instruction as to Count One of the Superseding Indictment. For example, Freeman's proposed jury instructions requested that each juror be instructed to "unanimously agree about which three [or more predicate] violations the Defendant committed." <u>Id.</u> Similarly, he later proposed the following, additional instruction:

51

> Regarding the substantive counts charging a defendant with the advertisement of child pornography, the transportation and shipment of child pornography, and the receipt of child pornography, if there was evidence presented showing more than one incident that could constitute a violation of the respective statute, you must <u>unanimously agree on at least one specific incident that would constitute a violation of the statute in order to find the defendant guilty.</u>

(emphasis added). The Government's own proposed jury instruction as to Count One contained no such requirement for unanimity. On the recommendation of the Government, the defendants' proposals were rejected and the district court's jury instructions made no reference to unanimity. The defendants now appeal that jury instruction, claiming that "it [is not only] impossible to conclude beyond a reasonable doubt that the jury would have unanimously found that [they] committed three or more specific violations, [but] it is also impossible to conclude beyond a reasonable doubt that the jury determined [they] acted in concert with the same three persons."

The Supreme Court has considered this same issue in a similar context. In Richardson v. United States, 526 U.S. 813 (1999), the Court was faced with a district court's refusal to issue a unanimity instruction in the context of the CCE

statute, 21 U.S.C. § 848, which prohibits "engag[ing] in a continuing criminal

enterprise."[39] Id. at 815. Section 848 states:

> [A] person is engaged in a continuing criminal enterprise if --
> (1) he violates any provision of [the federal drug laws, *i.e.*,] this subchapter
> or subchapter II of this chapter the punishment for which is a felony, and
> (2) such violation is a part of a continuing series of violations of [the federal
> drug laws, i.e.] this subchapter or subchapter II of this chapter -
> > (A) which are undertaken by such person in concert with five or more
> > other persons with respect to whom such person occupies a position
> > of organizer [or supervisor or manager] and
> > (B) from which such person obtains substantial income or resources.

§ 848(c).

In Richardson, the United States prosecuted a man named Eddie Richardson

for his involvement in organized crime and related criminal activity. At trial, the

Government presented evidence that Richardson had organized a Chicago street

gang that distributed heroin, crack cocaine, and powder cocaine for a number of

years. Also, the Government's evidence showed that Richardson had run the gang.

After the close of evidence, Richardson requested the district court instruct the

jury that they must "unanimously agree on which three acts constituted [the] series

of violations" within the meaning of § 848(c). Richardson, 526 U.S. at 816

---

[39] We have already noted the similarity between the CCE statute and the
CEE statute. See Section IV(A), supra. Thus, the interpretation of the former can
guide the interpretation of the latter.

(alteration in original). The district court denied that request, instead instructing the jury only that "they must unanimously agree that the defendant committed at least three federal narcotic offenses," while adding that they did not "have to agree as to the particular three or more federal narcotics offenses committed by the defendant." Id. The Seventh Circuit upheld the district court's jury instruction. United States v. Richardson, 130 F.3d 765 (7th Cir. 1997). On review, the relevant issue before the Richardson Court was whether each violation constituted an element of the crime for engaging in a CCE, or instead whether predicate offenses for a CCE violation were simply a "means" of violating the statute.

Noting that the statutory language was fairly ambiguous as to intent, nonetheless the Supreme Court found that the plain meaning of "violation" seemed to imply a requirement for individual proof. Id. at 818-19. Similarly, the breadth of any activity that could be defined as a "violation" counseled in favor of finding that Congress had intended each violation to be proven individually. Id. at 819. As a final consideration, the Court noted that its prior cases had emphasized that "the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means . . . ." Id. at 820 (emphasis added). See also Schad v. Arizona, 501 U.S. 624, 651 (1991) (Scalia, J.,

concurring) ("We would not permit . . . an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday . . . ."). Therefore, the Court held that predicate offenses are elements of a CCE charge and require unanimous accord from the jury.

When considering the factors deemed relevant by the Richardson Court, we find those same factors require a similar finding here. First, there can be no doubt that the language of the CEE statute indicates that each individual violation of § 2252A(g)(2) is an element, rather than a means. Just as in Richardson, where the Court indicated that the terms "violates" and "violation" were "ordinarily entrust[ed to] a jury," Richardson, 526 U.S. at 818, § 2252A(g)(2) uses the same diction in criminalizing a child exploitation enterprise. Therefore, "hold[ing] that each 'violation' here amounts to a separate element is consistent with a tradition of requiring juror unanimity where the issue is whether a defendant engaged in conduct that violates the law." Id. at 818-19.

Second, the broad range of "violations" that qualify as CEE predicate offenses counsels in favor of considering each "violation" an element of a CEE offense. As the Supreme Court noted in Richardson with respect to 21 U.S.C. § 848, "the statute's word 'violations' covers many different kinds of behavior of

55

varying degrees of seriousness." Richardson, 526 U.S. at 819. The same applies to the CEE statute here. Section 2252A(g)(2) explicitly provides that any one of the three predicates can arise from a violation of "section 1591, section 1201 if the victim is a minor, or chapter 109A (involving a minor victim), 110 (except for sections 2257 and 2257A), or 117 (involving a minor victim) . . . ." § 2252A(g)(2). If we were to hold that each such predicate need not be agreed upon unanimously, we would be "permitting a jury to avoid discussion of the specific factual details of each violation, [which might] cover up wide disagreement among the jurors about just what the defendant did, or did not, do." Richardson, 527 U.S. at 819. This we cannot do.

Lastly, as in Richardson, our Court has long sought to ensure equity in the administration of jury verdicts. Where possible and to prevent unfairness, we require juries to find unanimously in regard to any aspect of a criminal violation that is both susceptible to proof and intrinsic to that crime. Indeed, unanimous agreement on underlying violations is required in contexts beyond that dealt with by the Richardson Court. See, e.g., United States v. Bradley, 644 F.3d 1213, 1300 n.147 (11th Cir. 2011) (noting proper jury instruction in money laundering conspiracy required unanimous agreement upon "which one or more of the types

56

of money laundering offenses [the defendants] conspired to commit" (emphasis in original)). Here, interpreting the "series of felony violations" as elements of a CEE violation rather than means of a CEE violation comports with the fairness underlying our criminal judicial system.

Therefore, following the Supreme Court's lead in <u>Richardson</u>, we conclude that jury members must agree unanimously as to which felony violations constitute a predicate within the series of "three or more separate incidents."

**2.**

Neither our finding nor the Government's concession ends the inquiry. The Government now argues that, even though such an instruction should have been given, the failure to give it amounts to harmless error under the circumstances at issue. See <u>Ross v. United States</u>, 289 F.3d 677, 683-84 (11th Cir. 2002) (holding failure to issue a unanimity instruction was harmless error).

"When reviewing the harmlessness of an error under the [applicable harmless error] standard, [i]f, when all is said and done, the [court's] conviction is sure that the error did not influence, or had but very slight effect, the verdict and the judgment should stand*." <u>Ross</u>, 289 F.3d at 683 (quotation marks and citations omitted). "But if a federal court is in grave doubt about whether a trial error of

federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." Id. (quotation marks and citations omitted).

Each of the defendants with but one exception, Ronald White, concedes that they were convicted of at least two predicate CEE offenses. McGarity, Freeman, Lakey, Lambert, Castleman, and Mumpower were each convicted of a substantive count for advertising child pornography,[40] as well as a substantive count for transportation of child pornography.[41] Each of those convictions constitutes a predicate offense under § 2252A(g). See § 2252A(g)(2).[42] The issue before us is therefore whether the jury unanimously convicted these six defendants of a third predicate offense.

_____

[40] Castleman was convicted of Count Five of the Superseding Indictment of advertisement of child pornography, in violation of 18 U.S.C. §§ 2251(d)(1) and (2); Freeman was convicted of Count Six; Lakey of Count Eight; Lambert of Count Nine; McGarity of Count Ten; and Mumpower was convicted of Count Twelve.

[41] Castleman was convicted of Count Seventeen of the Superseding Indictment of transportation of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and (2); while Freeman was convicted of Count Eighteen; Lakey of Count Nineteen; Lambert of Count Twenty; McGarity of Count Twenty-One; and Mumpower of Count Twenty-Two.

[42] 18 U.S.C. § 1512(c) is not a predicate crime under § 2252A(g).

To satisfy the necessity of a third predicate upon which to base the defendants' convictions for engaging in a CEE under § 2252A(g), the Government makes two arguments. First, that evidence of involvement in four to eight instances of advertisements, transportation, and receipt of child pornography was presented at trial as to each defendant but for Ronald White, which should permit an inference of a third predicate within the meaning of the CEE statute. Second, the Government argues that the defendants' convictions for conspiracy to both advertise and transport child pornography constitute a third predicate offense under § 2252A(g).

The first argument in reliance upon the "four to eight substantive advertisements and transportations" is unavailing. Although the Government presented evidence regarding specific instances of advertisement, transportation, and receipt of child pornography betwixt the members of the child pornography ring, the jury never agreed unanimously on which of those instances could serve as a predicate under the CEE statute. Indeed, those other four to eight violations were neither charged in the Superseding Indictment nor addressed in the jury's verdict form. Although, as noted above, predicate offenses need not be charged with specificity in an indictment, Alvarez-Moreno, 874 F.2d at 1410-11, they must

59

nonetheless be agreed to unanimously by a jury to obtain a conviction. Therefore, regardless of how much evidence was offered at trial by the Government, it would be improper to infer unanimous agreement as to a specific offense by the members of the jury in the absence of an express finding.

However, such inference is proper where, as here, the jury convicted six of the defendants of three counts that could serve as predicates for a CEE violation. Sawyer v. Holder, 326 F.3d 1363, 1366 (11th Cir. 2003) ("[T]he jury's unanimous finding of guilt on the five substantive drug offenses ensures that the core concern of the Richardson decision—that jurors might convict on the basis of violations for which there was non-unanimity—is not present in this case.").[43]

Notwithstanding the defendants' initial contention to the contrary, the inclusion of conspiracy violations within the penumbra of the CEE statute permits

---

[43] Other circuits find harmless error in similar circumstances so long as the jury returned unanimous guilty verdicts on three or more counts that could serve as predicate offenses. See, e.g., United States v. Escobar-de Jesus, 187 F.3d 148, 162 (1st Cir. 1999) (finding convictions on substantive counts were sufficient to satisfy Richardson standard); United States v. Long, 190 F.3d 471, 476 n.3 (6th Cir. 1999) (finding harmless error in CCE prosecution where "the jury also unanimously found [the defendant] guilty of more than three drug violations . . ."); United States v. Smith, 223 F.3d 554, 567-68 (7th Cir. 2000) (upholding CCE conviction on basis of five substantive convictions).

a conspiracy to serve as a predicate for a CEE conviction.[44] The statutory language is unambiguous: Section 2252A(g) provides that any felony violations under "section 1591, section 1201 if the victim is a minor, or chapter 109A (involving a minor victim), 110 (except for sections 2257 and 2257A), or 117 (involving a minor victim)" are eligible predicates for a CEE conviction. Conspiracy is one of the recognized offenses within those sections and chapters. See, e.g., 18 U.S.C. § 1201(c) ("If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life."). Nor is there any legislative indication that conspiracy offenses were meant to be excluded as predicates. Thus, a conspiracy conviction may serve as a predicate offense for a

_____

[44] We note with interest that the jury was instructed as to the unanimity requirement with regards to the conspiracy charge under the Superseding Indictment. After instructing the jury about the required elements of a conspiracy charge under Count Two of the Superseding Indictment, the district court further instructed that "in order to return a verdict of guilty [for conspiracy under Count Two], you must unanimously agree upon which of the offenses the Defendant conspired to commit." Subsequently, every defendant but Ronald White was found guilty of conspiracy as charged in Count Two. To make such a finding and to comply with the district court's instructions, the jury had to unanimously agree upon which offenses served as the predicate for the conspiracy conviction.

61

CEE prosecution.[45] Accord United States v. Jones, 918 F.2d 909, 910-11 (11th Cir. 1990) (affirming conspiracy may be predicate offense for CCE conviction); Young, 745 F.2d at 748-52 (same). We therefore affirm the CEE convictions of McGarity, Castleman, Lakey, Lambert, Freeman, and Mumpower.

However, Ronald White's conviction must be vacated. Unlike his co-defendants, White was convicted of only two predicate offenses: 1) Count Two, which charged him with conspiracy to advertise, receive and possess child pornography and to obstruct justice, in violation of 18 U.S.C. §§ 371, 2251 (d)(1), 2252(a)(1) and (2), and 1512(c)(2);[46] and 2) Count Thirty-Nine, which charged him with receipt of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (2). And, also unlike his co-defendants, he was neither charged with nor convicted of advertising child pornography or transporting child pornography. Because the

_____

[45] We note that a conspiracy offense may be considered as a predicate offense, notwithstanding that it has been vacated as a lesser-included offense for purposes of the CEE conviction. See, e.g., United States v. Miller, 116 F.3d 641, 678 (2d Cir. 1997) (holding that conspiracy conviction vacated as lesser-included offense of CCE conviction may still serve as a predicate offense for purposes of that CCE conviction.)

[46] As noted above, supra note 3, White was found not guilty of conspiring to transport and ship child pornography.

CEE statute requires three predicate offenses, we must therefore vacate White's

conviction for engaging in a child exploitation enterprise under Count One.

## VI.

The defendants also challenge the sufficiency of the evidence in support of

some of their respective convictions. To reverse a jury verdict based on the

insufficiency of the evidence, the defendant must show that a reasonable trier of

fact could not find the defendant guilty of the offense beyond a reasonable doubt.

United States v. Vera, 701 F.2d 1349, 1356-57 (11th Cir. 1983). In evaluating

such a claim, the record is viewed in the light most favorable to the jury verdict,

drawing all reasonable inferences and resolving all questions of credibility in

favor of the Government. Id. The verdict shall be affirmed so long as a reasonable

juror could conclude that the evidence establishes guilt beyond a reasonable doubt.

See id. at 1357. It is not necessary that the evidence exclude every reasonable

hypothesis of innocence. Id. "A jury is free to choose among reasonable

constructions of the evidence." Id. (quotation marks and citations omitted).

## A.

First, Lambert challenges his conviction for knowingly transporting and

shipping, or attempting to transport and ship, child pornography in violation of 18

U.S.C. §§ 2252A(a)(1) and (2), claiming it should be reversed for insufficiency of evidence. While Lambert acknowledges that he possessed, received, and advertised child pornography, he denies that he shipped or transported such child pornography to others. Specifically, Lambert relies upon certain testimony at trial that indicated that law enforcement never downloaded the child pornography that was claimed to have been posted by Lambert to other group members.

The record does not support Lambert's argument. At trial, the Government introduced multiple newsgroup text posts under various of Lambert's monikers in which he referred his colleagues to child pornography he had uploaded for their benefit. For instance, within a two-week period in November 2006, Lambert posted at least twice in the group being used by the child pornography ring, informing his fellow members of images and videos he had uploaded. In the first encrypted post, which was posted on November 15, 2006 in the public newsgroup then used by the child pornography ring, he identified the newsgroup in which he had posted the child pornography, the subject of his post, the file name under which he had saved the child pornography, the fictional name under which he had posted, and explicit instructions on how to view it. In the second encrypted post, which was posted on November 21, 2006, he responded to an earlier post by a ring

64

member nicknamed "Peaches," notifying the ring members of additional pornography he was posting. Again, as he had on November 15, 2006, Lambert identified the newsgroup in which he had posted the binary file of child pornography, the subject name of the post, the file name under which he had saved the child pornography, the fictional name under which he posted, and explicit instructions on how to view it. As proof that it was Lambert who had posted both times, the Government introduced business records of his newsgroup provider and cable provider indicating that both posts—the one on November 15, and the one on November 21—had been posted by Marvin Lambert from his newsgroup account and from his IP address, both of which Lambert paid for with a credit card in his own name. Notwithstanding this evidence, Lambert argues that there was only "speculation that on one occasion [he] might have transmitted or sent child pornographic images by computer."

Lambert's argument presumably hinges on the oversight of either the FBI or Constable Power to capture the child pornography that Lambert had uploaded. Such an argument necessarily fails, however, in light of Lambert's own confession to the FBI agents who came to his home on February 29, 2008. The agent to whom he confessed, Special Agent Emily Ann Odom, testified at trial that Lambert was

read his constitutional rights, but elected to speak with her that morning at his home. There, he confessed that he had both "uploaded and downloaded" child pornography. That confession was never contradicted at trial. See United States v. Andrews, 953 F.2d 1312, 1325 (11th Cir. 1992) (approving the sufficiency of evidence underlying conviction based in part on defendant's confession to law enforcement). See also United States v. Aumais, 656 F.3d 147, 149 n.1 (2d Cir. 2011) (approving enhancement for trading child pornography where defendant had previously admitted such conduct to law enforcement).

Viewing this evidence in light of the heavy burden borne by any defendant seeking to overturn a conviction, we find Lambert cannot meet the burden. Even in the absence of Lambert's confession to Special Agent Odom, circumstantial evidence established that Lambert "transported" the child pornography through various uploads.[47] Therefore, we cannot say that "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

_____

[47] Lambert's argument is akin to the "if a tree falls in the woods, but no one is around to hear it, does it make a sound" inquiry. Simply because the investigating agents did not track the child pornography Lambert told his peers he had uploaded does not mean that Lambert's upload did not occur. A reasonable juror was entitled to find that such evidence supported a finding beyond reasonable doubt of transportation of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and (2). See Vera, 701 F.2d at 1356-57.

66

Wright, 392 F.3d at 1273. We affirm Lambert's conviction under Count Twenty of the Superseding Indictment.

**B.**

Having found that the defendants' convictions for Count Forty of the Superseding Indictment must be vacated due to the insufficiency of Count Forty as charged therein, see Section IV(B), supra, we decline to address the sufficiency of the evidence in this regard.[48]

**VII.**

---

[48] Without addressing in detail the evidence put forth at trial in support of Count Forty, we note that the vagueness of the charge was rivaled by the tenuousness of evidentiary support at trial. As the First Circuit noted in Murphy, an indictment lacking some specificity regarding a violation of § 1512(c) results in an "open-ended" prosecution.

Here, the prosecution relied upon a similarly open-ended and expansive view of the requirements for a § 1512(c) offense, neither anchoring the prosecution to any specific official proceeding nor proving knowledge on the part of the defendants as to those official proceedings. Instead, the Government broadly argued the necessary obstructive acts arose from the child pornography ring's methods of ensuring it would not be detected by law enforcement. However, it goes without saying that any thinking criminal wants to avoid detection and takes steps they consider appropriate to prevent it; whether it is wearing a glove to protect against leaving fingerprints in a case involving theft, or wearing a mask to prevent identification during a robbery. Section 1512(c) was simply not intended to further criminalize that type of activity.

67

All of the defendants challenge as violative of the Double Jeopardy Clause their convictions under both Count One and Count Two. They contend their convictions are "multiple punishments for the same offense." Illinois v. Vitale, 447 U.S. 410, 415 (1980) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969)). As noted above, Count One of the Superseding Indictment charged the defendants with "knowingly and willfully engag[ing] in a child exploitation enterprise," in violation of 18 U.S.C. § 2252A(g), while Count Two charged them with conspiring to commit certain acts underlying that child exploitation enterprise. All of the defendants now before us were convicted of both counts.

We need not address this argument again, having passed on the same issue previously in Wayerski. There, we held that

> § 2252A(g) requires proof that a defendant acted "in concert" with at least three other persons. This conduct is an element of the child exploitation enterprise offense that requires the same proof of an agreement that would also violate the conspiracy offense charged in Count 2 of the defendants' indictment. Because the defendants' conspiracy convictions did not require proof of facts different from the child exploitation enterprise offense's "in concert" requirement, we hold that the defendants' conspiracy convictions were lesser included offenses and violated the Double Jeopardy Clause.

Wayerski, 624 F.3d at 1351 (citation omitted). Moreover, the Government concedes that Count Two is a lesser-included offense of Count One.

Accordingly, we vacate McGarity, Freeman, Lakey, Lambert, Castleman, and Mumpower's conspiracy convictions under Count Two as violative of the Double Jeopardy Clause. See, e.g., United States v. Boyd, 131 F.3d 951, 954-55 (11th Cir. 1997) (noting the "proper remedy for convictions on both greater and lesser included offenses is to vacate the conviction and the sentence of the lesser included offense"). However, given our decision to vacate White's conviction under Count One, no Double Jeopardy attaches to his Count Two conviction. Cf. United States v. Reed, 980 F.2d 1568, 1581 (11th Cir. 1993) (affirming conviction for conspiracy in context of Double Jeopardy appeal, although on different grounds). Thus, we affirm White's Count Two conviction.

## VIII.

After the jury returned its guilty verdicts as to each defendant, the defendants were sentenced individually. Upon review, we note that the terms of the sentences, all of which ran concurrently for each individual, may be considered in three distinct groups. The defendants now allege error collectively and individually.

The first group, those with the heaviest sentences, includes McGarity, Freeman, and Mumpower. Each was convicted of the following charges in the

69

Superseding Indictment: Count One, engaging in a child exploitation enterprise, for which they received life sentences; Count Two, conspiracy to advertise, transport/ship, receive, and possess child pornography, and to obstruct an official proceeding, for which they received 600-month sentences; advertising child pornography, for which they received 600-month sentences;[49] transporting or shipping child pornography, for which they received 480-month sentences;[50] receiving child pornography, for which they received 480-month sentences;[51] and Count Forty, obstructing justice, for which they received 240-month sentences.

Likewise, the second group of defendants were also sentenced to the same terms of imprisonment after conviction of the same offenses. Castleman, Lakey, and Lambert were each convicted of the following charges from the Superseding Indictment: Count One, engaging in a child exploitation enterprise, for which they received life sentences; Count Two, conspiracy to advertise, transport/ship, receive, and possess child pornography, and to obstruct an official proceeding, for

[49] McGarity was convicted of Count Ten, while Freeman and Mumpower were convicted, respectively, of Counts Six and Twelve.

[50] McGarity was convicted of Count Twenty-One, while Freeman and Mumpower were convicted, respectively, of Counts Eighteen and Twenty-Two.

[51] McGarity was convicted of Count Thirty-Three, while Freeman and Mumpower were convicted, respectively, of Counts Twenty-Nine and Thirty-Five.

which they received 360-month sentences; advertising child pornography, for which they received 360-month sentences;[52] transporting or shipping child pornography, for which they received 240-month sentences;[53] receiving child pornography, for which they received 240-month sentences;[54] and Count Forty, obstructing justice, for which they received 240-month sentences.

The district judge sentenced the remaining defendant, Ronald White, to a sentence different than any of his co-defendants. White was convicted of four offenses: Count One, engaging in a child exploitation enterprise, for which he received a life sentence; Count Two, conspiracy to advertise, receive, and possess child pornography, and to obstruct an official proceeding, for which he received a 360-month sentence; Count Thirty-Nine, receiving child pornography, for which

---

[52] Castleman, Lakey, and Lambert were convicted, respectively, of Counts Five, Eight, and Nine of the Superseding Indictment.

[53] Castleman, Lakey, and Lambert were convicted, respectively, of Counts Seventeen, Nineteen, and Twenty of the Superseding Indictment.

[54] Castleman, Lakey, and Lambert were convicted, respectively, of Counts Twenty-Eight, Thirty-One, and Thirty-Two of the Superseding Indictment.

he received a 240-month sentence; and Count Forty, obstructing justice, for which he received a 240-month sentence.[55]

Now, the defendants raise the following objections to their sentences.

**A.**

First, the defendants contend that their life sentences are grossly disproportionate to their offenses and violate the Eighth Amendment's prohibition on cruel and unusual punishment. In support, they note the seemingly disproportionate sentences in relation to other, non-violent crimes. Additionally, they argue that the United States is out of touch with its international peers in regards to its punishment of possessors of child pornography.

We review de novo the legality of a sentence under the Eighth Amendment. United States v. Moriarty, 429 F.3d 1012, 1023 (11th Cir. 2005). However, when a defendant fails to object on those grounds before the trial court, we review only for plain error.[56] United States v. Raad, 406 F.3d 1322, 1323 (11th Cir. 2005).

---

[55] As noted above, we vacate White's convictions under Count One and Count Forty.

[56] Neither McGarity nor White objected to their sentences before the district court on Eighth Amendment grounds, so their objections will be reviewed for plain error. The remaining defendants' sentencing claims will be reviewed de novo. See Raad, 406 F.3d at 1323.

Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Our jurisprudence recognizes a "narrow proportionality principle that applies to noncapital sentences." United States v Johnson, 451 F.3d 1239, 1242 (11th Cir. 2006) (quotation marks omitted). However, "[o]utside the context of capital punishment, there [have been] few successful challenges to the proportionality of sentences."[57] Id. The reason for such few successful challenges is the level of deference we accord Congress's "authority to determine the types and limits of punishments for crimes." Id. at 1242-43 (quotation marks omitted). Accordingly, the burden of proof is on the defendant to make a threshold showing that his sentence is "grossly disproportionate to the offense committed." Id.

As an initial matter, we note that the defendants' sentences were all within the applicable advisory guidelines. Our reasoning in Farley is instructive on the constitutionality of the sentences vis-à-vis the advisory guidelines. See Farley, 607

---

[57] Indeed, we have "never found a term of imprisonment to violate the Eighth Amendment, and outside the special category of juvenile offenders the Supreme Court has found only one to do so." United States v. Farley, 607 F.3d 1294, 1343 (11th Cir. 2010). The only case where the Supreme Court has found a violation of the Eighth Amendment due to the length of imprisonment was Solem v. Helm, 463 U.S 277, 280-81 (1983), in which the Court overturned a sentence of life imprisonment for writing a bad check for $100.

F.3d at 1336-45. In that case, we considered at great length the propriety of Eighth Amendment challenges to sentences that fell within the parameters of the advisory guidelines. In approving a mandatory minimum sentence of thirty years for an offense involving the intended sexual abuse of a child, we affirmed that we must consider "the harm caused by the type of crime involved." Id. at 1344 (citing Harmelin v. Michigan, 501 U.S. 957 (1991)).

On review of the type and severity of the defendants' crimes, we do not find their sentences grossly disproportionate. In a surveillance that lasted for several years and spanned several countries, law enforcement observed the defendants and their cohorts sharing more than 400,000 images and 1,000 videos, many of which showed brutal and sadistic sexual acts being committed against children of all ages and nationalities. Standing alone, the number of images and videos at issue here is sufficient to permit the sentences imposed. Accord United States v. Turner, 626 F.3d 566, 573-74 (11th Cir. 2010) (upholding 300-month sentence for possession of 600 images of child pornography). However, the violence, disrespect, and inhumanity of the acts photographed and recorded, gleefully shared between the defendants and other members of their child pornography ring, further evidences the type and severity of the defendants' actions. See also Farley, 607 F.3d at 1343-

56 (refusing to find unconstitutional statutory minimum mandated by Congress in similar child-related offense). Considering the harm caused by the child pornography ring—sharing hundreds of thousands of images and videos reflecting the most obscene acts being done to defenseless minors, encouraging the production of more such obscenity, and energizing the continuous cycle of child sexual abuse—none of the defendants' sentences exceed constitutional limitations.

In so finding, we affirm our recognition in <u>Farley</u> that "the sexual abuse of children, and the use of the internet to facilitate that abuse, are serious problems affecting the health and welfare of the nation." <u>Farley</u>, 607 F.3d at 1345. The physical and emotional impact of child pornography upon its victims is only just starting to be understood. <u>See, e.g.</u>, <u>United States v. Irey</u>, 612 F.3d 1160, 1206-07 (11th Cir. 2010) (<u>en banc</u>) (detailing physical and emotional harm resulting from sexual abuse related to production of child pornography);  <u>United States v. Pugh</u>, 515 F.3d 1179, 1195-98 (11th Cir. 2008) (same). The district judge recognized this impact and handed down appropriately proportionate sentences.

As a final matter, we also reject the defendants' claim that their sentences are unconstitutional in comparison to some sentences imposed by foreign

jurisdictions for similar offenses.[58] We are bound to apply the laws of our country as legislated by Congress and interpreted by subsequent case law. While our courts have sometimes looked to foreign jurisdictions for the sake of comparison in the context of the Eighth Amendment, Roper v. Simmons, 543 U.S. 551, 575-79 (2005) (considering American allowance of death penalty to juvenile offenders in context of international community), we have never delimited our Constitution or the powers of our Government on that basis alone. Compare Roper, 543 U.S. at 604 (O'Connor, J., dissenting) (considering weight given to international findings); with Roper, 543 U.S. at 622-28 (Scalia, J., dissenting) (rejecting consideration of other countries' findings). Nor will we do so now. Our laws and our Constitution, rather than those of foreign jurisdictions, control our findings.

**B.**

Lakey, Castleman, and Lambert argue violations of the Fifth and Sixth Amendments in enhancing their sentences based on facts proved only by a preponderance of the evidence. In support, they rely on United States v. O'Brien, 130 S.Ct. 2169 (2010). Additionally, White argues that the district court violated

---

[58] For example, Castleman argues that the laws of such sovereign nations as England, Canada, and Hong Kong–all of which more lightly punish possessors of child pornography–should guide our hand.

his due process rights in relying upon speculation that he would pose a danger to children if released from prison. In the absence of evidence, White contends that such reliance was improper.[59]

We have repeatedly denied both Fifth and Sixth Amendment challenges under these circumstances. As to the former, we have rejected the argument that the Fifth Amendment requires that conduct not covered by charged offenses must be proved beyond a reasonable doubt. See United States v. Ghertler, 605 F.3d 1256, 1269 (11th Cir. 2010) (foreclosing argument that judicial fact-finding by a preponderance of the evidence violates the Fifth Amendment). Likewise, under the Sixth Amendment, we do not limit a district court's ability to engage in judicial fact-finding at sentencing. So, for instance, in United States v. Belfast, we found that "[u]nder an advisory guidelines regime, judicial fact-finding about relevant conduct that supports a sentence within the statutory maximum set forth in the United States Code does not violate the Sixth Amendment." 611 F.3d at 827; see also United States v. Chau, 426 F.3d 1318, 1323 (11th Cir. 2005) (relying upon

---

[59] As with our consideration of the defendants' Eighth Amendment claim, we review de novo all constitutional challenges to a sentence. United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005). Because White did not raise a due process challenge until appeal, we review his argument under the plain-error standard.

unanimous Supreme Court agreement that the use of extra-verdict enhancements is not unconstitutional in an advisory guidelines system).

Consequently, these challenges have no merit.

## C.

All of the defendants challenge the two-level guideline enhancement applied under U.S.S.G. § 3C1.1, claiming their actions to escape detection were not obstructive but rather simply prophylactic. The defendants also contend the district court erred in not making individual findings of fact supporting the enhancement, while Castleman contends that his own actions in denying law enforcement entry into his home and running a "wipe" program on his computer cannot amount to obstruction where there was no proof at trial of the efficacy of the "wipe" program.[60]

---

[60] In any event, to the extent that Castleman contends the enhancement for obstruction was inappropriate because there was no proof of the efficacy of the "wipe" program, that argument is unavailing. See, e.g., United States v. Garcia, 208 F.3d 1258, 1262 (11th Cir. 2000), vacated and remanded on other grounds by Garcia v. United States, 531 U.S. 1062 (2001), reinstated by United States v. Garcia, 251 F.3d 160 (11th Cir. 2001).

Section 3C1.1 permits a two-level increase of a defendant's base offense level if certain conditions are met. Specifically, it allows a two-level enhancement if:

> (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense[.]

U.S.S.G. § 3C1.1. While the defendants claim that their actions taken to avoid detection should not qualify for enhancement under § 3C1.1, we have recently rejected this same argument in Wayerski, 624 F.3d at 1352. As we found in that case, where there is ample evidence of "numerous obstructive actions," the Guidelines clearly contemplate that such actions qualify for the enhancement.[61] See Wayerski, 624 F.3d at 1352 (noting previous recognition "that there is no requirement that [a] defendant's obstructive acts occur subsequent to the formal commencement of an investigation"). See also U.S.S.G. § 3C1.1 comment. (n.1) (permitting enhancement where "[o]bstructive conduct [] occurred prior to the

---

[61] We distinguish this enhancement for obstruction of justice from its statutory counterpart. Section § 1512(c) requires obstructive acts taken in contemplation of "official proceedings," which is narrower than § 3C1.1, which has no such requirement.

start of the investigation of the instant offense of conviction . . . [and] was purposefully calculated, and likely, to thwart the investigation or prosecution . . . ."); Garcia, 208 F.3d at 1262. Accordingly, we reject the defendants' challenge to the two-level enhancement for obstruction of justice.

Moreover, the district judge did not err in failing to make specific individual findings. In Wayerski, we explained that a district court need not make specific findings "where . . . it both adopts a presentence investigation report that contains specific findings and the defendant fails to request that the court make more specific findings." Wayerski, 624 F.3d at 1352. Here, the court explicitly adopted the defendants' PSRs, all of which contained specific findings. Moreover, none of the defendants requested more specific findings. Therefore, there was no error.

We also refuse to hold clearly erroneous the factual finding regarding Castleman's obstruction of justice. The evidence submitted at trial was clear regarding what transpired when agents sought lawful entry to Castleman's home: agents "knocked and announced" for over thirty minutes, but received no response from within the home, even though agents at the opposite end of the home could clearly distinguish the "knock and announce." It took the agents calling a locksmith—and entry through the garage, because the front door was barred from

80

within—for them to finally gain access into Castleman's home. Once there, they found Castleman next to his computer, running a "wipe" program on his computer. It took the quick and decisive thinking of a FBI forensic computer examiner to recognize what Castleman was doing and take appropriate steps to limit the damage already done. Such proof surely substantiates the district court's imposition of the enhancement for obstruction.

**D.**

Two of the defendants, Mumpower and Castleman, also challenge the five-level enhancement applied under § 2G2.2(b)(5) for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor. While Mumpower concedes that his enhancement was based on three previous incidents of child molestation—he molested his stepdaughter and stepson, convinced three female children to expose their genitals and allow subsequent fondling, and encouraged an eight-year-old girl to sit on his naked lap—he nonetheless argues that those acts occurred over 30 years before his sentence and should not be considered part of a "pattern of activity." Castleman, on the other hand, argues that his sexual abuse of his daughter, which was unrelated to the offense for which he was convicted, cannot be considered "relevant conduct" under § 1B1.3, and thus the Guideline

81

commentary to § 2G2.2(b)(5), which explicitly authorizes inclusion of such conduct, is internally inconsistent.

By its express terms, § 2G2.2(b)(5) allows a five-level increase "if the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." Under the "Definitions" commentary (note 1) to that section, "pattern of activity" refers to "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." U.S.S.G. § 2G2.2, cmt. (n.1). However, another section of the Guidelines, § 1B1.3, provides that, unless otherwise stated, "relevant conduct" includes actions "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a). It is the interplay between these two sections upon which the defendants rely.

We find no difficulty in reconciling these two sections. Indeed, in interpreting an earlier version of the same enhancement containing identical language with identical commentary, we determined that "the Sentencing

Commission did not intend to limit the pattern of activity the court could consider to conduct related to the offense of conviction." United States v. Anderton, 136 F.3d 747, 751 (11th Cir. 1998) ("Because the [commentary] language . . . clearly permits an increased offense level for conduct unrelated to the offense of conviction, the district court did not err in increasing the [defendants'] offense levels."). Likewise, we held in Turner that "[n]othing in § 2G2.2(b)(5) or its commentary suggests that the 'pattern of activity' must be temporally close to the offense of conviction." 626 F.3d at 573. There, we permitted the five-level enhancement based on a defendant's repeated sexual abuse of a child that had occurred over twenty years before. Id. at 573.

Here, we discern no basis for not following Turner. Although Mumpower's sexual abuse of his stepdaughter and stepson and three other little girls occurred in the 1970s or 1980s, even such temporally distant behavior may constitute a pattern of activity under § 2G2.2(b)(5). Accord Turner, 626 F.3d at 573 (noting that "pattern of activity" under § 2G2.2(b)(5) does not have to be "temporally close to the offense of conviction" and thus upholding enhancement based on conduct occurring years prior). Therefore, we reject Mumpower's challenge.

Castleman's argument is similarly unavailing. Explicit language within § 1B1.3 provides that relevant conduct is conduct relating to the offense of conviction "unless otherwise specified." U.S.S.G. § 1B1.3(a). As we found in Anderton, the Guidelines "clearly permit[] an increased offense level for conduct unrelated to the offense of conviction." Anderton, 136 F.3d at 751. Likewise, we find that the clear commentary language of the Guidelines authorizes an offense level upward adjustment for a prior "pattern of activity" based upon Castleman's sexual abuse of his daughter, notwithstanding its lack of relationship to the offense of conviction.

### E.

Defendants Lambert and Lakey also assign error to the district court's decision to apply an enhancement for their offenses involving a victim "who had not attained the age of 12 years," pursuant to U.S.S.G. § 2G2.6(b)(1). Similarly, Castleman contends that his guidelines range was improperly calculated on the same basis. Each of the defendants claims that the enhancement was improperly applied to him because he did not proximately cause any injury to the victims of

the child pornography, which they claim was caused by other individuals directly involved in the underlying sexual molestation.[62]

By their terms, the relevant sections of the Sentencing Guidelines provide for a four-level and a two-level enhancement, respectively, if "a victim . . . had not attained the age of 12 years." U.S.S.G. § 2G2.6(b)(1). Therefore, we must determine whether 1) the individuals depicted in the child pornography were victims; and 2) whether they were less than 12-years-old.

Both statutory and common law are clear in defining as victims any minors depicted in child pornography. See 18 U.S.C. § 3509(a)(2)(A). See also New York v. Ferber, 458 U.S. 747, 758-60 & n.10 (1982); Pugh, 515 F.3d at 1195-98. Definition as a victim in this context requires no relationship between a possessor of child pornography and the child depicted therein. Instead, a child is a victim where he or she has been subjected to "a crime of physical abuse, sexual abuse, or exploitation." § 3509(a)(2)(A). Accordingly, the defendants' contention that proximate cause is required in this context is erroneous.

---

[62] Because only Lakey objected to the district court about this enhancement, we review his appeal de novo. Ferreira, 275 F.3d at 1024. However, we review the other defendants' appeals on this basis for plain error. United States v. Bonilla, 579 F.3d 1233, 1238 (11th Cir. 2009).

Nor is there any real dispute here that the individuals depicted in the thousands of child pornography images and videos were not minors, as multiple FBI agents testified that many of those images involved individuals known to be children at the time of the abuse. Moreover, the defendants submitted no contradictory evidence regarding the age of those individuals depicted in any of the thousands of child pornography images and videos found in the defendants' possession.

Given both aspects of the enhancements are satisfied here, we find no error.

**F.**

Only Castleman challenges the five-level enhancement applied to his sentence for the receipt, or expectation of receipt, of a thing of value, pursuant to U.S.S.G. § 2G2.2(b)(3)(B). He argues that he never expected to receive—and in fact did not receive—anything in exchange for his online posting of child pornography.

Section 2G2.2(b)(3)(B) provides for a five-level increase for the transportation of material involving the sexual exploitation of a minor if the underlying offense involved "[d]istribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain." U.S.S.G.

§ 2G2.2(b)(3)(B). Commentary to the Guidelines further defines that operative phrase as "any transaction, including bartering or other in-kind transaction, that is conducted for a thing of value but not for profit." U.S.S.G. § 2G2.2, cmt. (n.1). The Guidelines recognize that a "thing of value" may be comprised of child pornographic material received in trade, id., as does our case law. See, e.g., United States v. Bender, 290 F.3d 1279, 1286 (11th Cir. 2002) ("[W]hen a defendant trades child pornography in exchange for other child pornography, the defendant has engaged in 'distribution for the receipt, or expectation of receipt, of a thing of value.'") (quoting 2000 version of U.S.S.G. § 2G2.2(b)(2)).

The trial record amply evinces the nature of the child pornography exchange between the ring members. During the course of the investigation, the ring shared more than 400,000 images and 1,000 videos of child pornography, which was often posted after a specific request by one of the ring members. The exchange of child pornography—and the perceived onus on its members to participate in the exchange—was central to the workings of the ring. Castleman himself participated in the group sharing, both requesting the upload of certain child pornography and apologizing for not being "able to keep up" due to a medical condition. Communications such as these evidence the propriety of the "thing of value"

87

enhancement, where it is readily apparent that Castleman "sent child pornography so that he would receive other child pornography in exchange." Bender, 290 F.3d at 1287. Thus, notwithstanding Castleman's contention to the contrary, there was clearly an expectation of sharing amongst the ring members. Under such circumstances, the imposition of the five-level enhancement was proper.

**G.**

Freeman contends that his sentence should not have been enhanced because of a prior Georgia state conviction. In 1997, he was convicted of enticing a minor for indecent purposes, in violation of Ga. Code Ann. § 16-6-5. He now argues that, because that conviction was not predicated on touching or attempting to touch a minor, it cannot serve as the predicate for a sentencing enhancement under 18 U.S.C. §§ 2251(e) and 2252A(b)(1). In other words, he argues that because both those enhancements apply only if the prior conviction involved "abusive sexual contact," rather than the more expansive "abusive sexual conduct," neither is applicable here.

Both § 2251(e) and § 2252A(b)(1) criminalize activity involving sexual exploitation of minors, and both enhance the punishment on the basis of an earlier state conviction. Section 2251(e) provides that any person who violates, attempts,

88

or conspires to violate it shall be "imprisoned not less than 15 years nor more than 30 years," 18 U.S.C. § 2251(e), and further provides that a term of "not less than 25 years nor more than 50 years" is required if an individual "has one prior conviction . . . under the laws of any State relating to aggravated sexual abuse, sexual abuse, [or] abusive sexual contact involving a minor." Id. Similarly, § 2252A(b)(1) mandates a term of imprisonment for "not less than 5 years and not more than 20 years," but increases that term of imprisonment to "not less than 15 years nor more than 40 years" if an individual has "a prior conviction . . . under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor." Id.

Although our case law is sparse on this issue, those cases that exist broadly interpret the phrase "abusive sexual conduct." So, for example, we held in Johnson that a prior state conviction for performing a lewd act in front of a minor related to "abusive sexual conduct involving a minor," and was therefore subject to an enhancement under § 2252A(b)(1). Johnson, 451 F.3d at 1243. Likewise, we concluded in United States v. Maupin, 520 F.3d 1304, 1308 (11th Cir. 2008), that a nolo contendere plea to state charges for possession of child pornography constituted a prior state conviction within the meaning of § 2252A(b)(1) and (2).

89

Our circuit is not alone in this broad interpretation. The Supreme Court, although in a different statutory context, has also interpreted the phrase "relating to" in an inclusive fashion. In Morales v. Trans World Airlines, Inc., the Court considered the phrase in the context of 18 U.S.C. § 1305(a)(1) and determined that it means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with . . . ." 504 U.S. 374, 383 (1992) (citation omitted). Likewise, although not binding on us, the Ninth Circuit has similarly interpreted the statute in question, stating that "§ 2252A does not simply mandate a sentencing enhancement for individuals convicted of state offenses equivalent to sexual abuse. Rather, it mandates the enhancement for any state offense that stands in some relation, bears upon, or is associated with that generic offense." United States v. Sinerius, 504 F.3d 737, 743 (9th Cir. 2007) (emphasis in original).

Because Freeman's prior conviction was under Georgia law, we reference Georgia's own interpretation of this issue. Georgia defines the offense for which Freeman was convicted as occurring when "a person commits the offense of enticing a child for indecent purposes when he or she solicits, entices, or takes any child under the age of 16 years to any place whatsoever for the purpose of child

90

molestation or indecent acts." Ga. Code Ann. § 16-6-5(a). Georgia courts define "indecent" as notice to the defendant that "he or she was being charged with committing an unlawful act with a lustful intent against a child." Hammock v. State, 411 S.E.2d 743, 746 (Ga. Ct. App. 1991). By its nature, then, § 16-6-5(a) "proscribes the solicitation of a minor to engage in sexual conduct or conduct which, by its nature, is a sexual offense against a minor." State v. Marshall, 698 S.E.2d 337, 339-40 (Ga. Ct. App. 2010) (quotation marks omitted).

Therefore, under Georgia's definition of Freeman's prior conviction and our precedent applying the enhancement in question, we find that the district judge did not err. In that Freeman's prior conviction was founded upon his discussions of illicit sexual acts with a minor, such actions necessarily related to "aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor" under 18 U.S.C. § 2252A(b)(1). See Morales, 504 U.S. at 383. In this context, any perceived difference argued by Freeman between "abusive sexual conduct" and "abusive sexual contact" is overcome by our interpretation of the phrase "relating to." Accordingly, the district court did not err in enhancing Freeman's sentence under either § 2251(e) or § 2252A(b)(1).

**H.**

91

Lastly, all of the defendants argue that the district court erred when sentencing them to life in prison. In support, they contest the procedural and substantive reasonableness of their sentences. As to procedural reasonableness, they claim that the district court erred in calculating their guidelines ranges. They also contend that the district judge created an unwarranted sentencing disparity by failing to provide each of them individual consideration. Challenging the substantive reasonableness of their sentences, the defendants assert that their sentences were greater than necessary to achieve the purposes of sentencing and that the district judge improperly relied upon the child pornography Guidelines, which they claim are flawed. We find that the defendants' sentences were neither procedurally nor substantively unreasonable.

**1.**

When reviewing the procedural reasonableness of a sentence, we will first ensure that "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." Gall v. United States, 552 U.S. 38, 51 (2007). See also United

States v. Williams, 526 F.3d 1312, 1322 (11th Cir. 2008) (same). In explaining its reasons for imposing a sentence, the district court need not discuss each factor. Irey, 612 F.3d at 1194-96. Rather, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Rita v. United States, 551 U.S. 338, 356 (2007). The district court's acknowledgment that it considered the defendants' arguments at sentencing and that it considered the factors set forth in § 3553(a) alone is sufficient explanation for a particular sentence. United States v. Scott, 426 F.3d 1324, 1329-30 (11th Cir. 2005).

On consideration of the voluminous trial record, we find no basis for any claim of procedural unreasonableness. To put the sentencing in its proper context, all of the defendants now before us were tried en masse. The Government, through an exhaustive case-in-chief, introduced individual proof of each defendant's offenses. For each defendant, the Government introduced numerous witnesses, including but not limited to Constable Power, the FBI agent-in-charge of the individual investigation relevant to each defendant, and numerous forensic experts who analyzed the postings saved by Power as well as those found on the defendants' computers.

There was therefore overwhelming evidence of each of the defendants' guilt and personal circumstances prior to their eventual convictions. It is in that context, then, that the district judge held the sentencing hearing. There, he listened to each defendant's arguments, reviewed in detail each defendant's PSI objections, and explained on the record that he arrived at each sentence after consideration of both the Guidelines and the factors delineated by 18 U.S.C. § 3553(a). As we noted in Scott, this type of inquiry and acknowledgment aids our inquiry into procedural reasonableness. Scott, 426 F.3d at 1330.

Moreover, the district judge did not miscalculate the defendants' guidelines ranges. The defendants were sentenced under two related guidelines: U.S.S.G. § 2G2.2, and U.S.S.G. § 2G2.6 ("CEE Guideline"). The results under those two guidelines varied according to the respective enhancements applicable to the defendants. The district judge sentenced McGarity, Castleman, Freeman, and Mumpower under Guideline 2G2.2, resulting in a total offense level of 47. Defendants Lakey, Lambert, and White were sentenced under the CEE Guideline, which resulted in a total offense level of 43 for each. As we have already considered and rejected the objections the defendants raised to their respective

94

applicable enhancements, we find that the district court did not err in its ministerial function of calculating the guidelines range and the resulting sentence.

**2.**

Turning next to the substantive reasonableness of the defendants' sentences, "we must, as the Supreme Court has instructed us, consider the totality of the facts and circumstances." Irey, 612 F.3d at 1189. "[O]rdinarily we . . . expect a sentence within the Guidelines range to be reasonable." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). We will vacate a sentence for substantive unreasonableness only upon a "definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Irey, 612 F.3d at 1190 (quotation marks omitted). The burden of proof is on the party challenging the sentence. United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010).

Although the defendants contend that their lengthy sentences were greater than necessary to achieve the varied goals of sentencing, we do not agree. During the sentencing, the district judge repeatedly recognized the extent, severity, and nature of the defendants' involvement in child pornography. Indeed, on more than

one occasion he observed that the instant case was the most egregious he had seen. As we have noted, the harm to the victim of child pornography cannot be overstated.

> [S]exually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults. Sexual molestation by adults is often involved in the production of child sexual performances. When such performances are recorded and distributed, the child's privacy interests are also invaded . . . .

Pugh, 515 F.3d at 1195-96.

Nor do we believe that the defendants' sentences here created an unwarranted sentencing disparity. Because of the advisory nature of the Sentencing Guidelines, any district court that considers the total offense level thereunder necessarily limits any unwarranted disparity that might arise in the sentences of defendants in diverse locales. See Gall, 552 U.S. at 54. A review of the record makes it clear that there is no concern over any unwarranted disparity here.

Therefore, we find that the defendants' sentences were neither substantively nor procedurally unreasonable.

## IX.

The final issue we address pertains to the district judge's restitution award against James Freeman. During the investigation leading up to trial, the Government identified a certain known child victim, "Amy," in the pornography possessed by the defendants.[63] Numerous still images and videos of Amy were found in the defendants' possession at the time of their arrest. However, the Government sought restitution only from defendant Freeman. In so doing, the Government relied upon 18 U.S.C. § 2259(c).

At the scheduled hearing, the district judge considered testimony from Amy's attorney, as well as two experts. Her attorney testified regarding the suffering of his client and her economic losses resulting from being a victim of child pornography. He also presented a case-study report he had commissioned from an economist, in which the Smith Economics Group opined that Amy's lost earnings totaled $2,855,173 and the cost of her future treatment was $512,681. Next, the district judge heard the testimony of an expert in forensic and developmental pediatrics, Dr. Sharon Cooper, who testified regarding the nature of harm suffered by victims of child pornography. Lastly, an expert in psychology

---

[63] "Amy" is a pseudonym, intended to protect the identity of the child victim of the pornography at issue. Amy was sexually molested by her uncle beginning when she was four-years-old.

with a focus on child trauma, Dr. Joyana Silberg, testified that she had evaluated Amy on four occasions—none of which occurred after Freeman's arrest or prosecution—and found that her condition had deteriorated since Amy learned of the widespread availability of her images on the internet. Ultimately, the district judge awarded restitution in the amount of $3,263,758.00 against James Freeman.

Now, Freeman appeals that award. In support, he states four bases for appeal: 1) any restitution award is barred by the Government's purported failure to offer proof that his possession of images and videos of Amy arose from his actions which were the subject of the Superseding Indictment; 2) Amy is not a "victim" within the meaning of § 2259;[64] 3) even if Amy qualifies as a victim under § 2259, the Government offered no proof that his conduct was the proximate cause of her injury;[65] and 4) the restitution amount was unreasonable. While we find Freeman's first two contentions meritless, we agree with Freeman's contention regarding proximate cause and therefore need not reach the reasonableness of the restitution

---

[64] "Whether a person is a victim is a legal conclusion we review de novo." United States v. McDaniel, 631 F.3d 1204, 1207 (11th Cir. 2011) (quotation marks and citation omitted).

[65] We review a factual finding of proximate cause for clear error. See McDaniel, 631 F.3d at 1207 (citing United States v. Robertson, 493 F.3d 1322, 1334 (11th Cir. 2007)).

amount. Accordingly, we remand for an evidentiary hearing to determine whether Amy's harm was proximately caused by Freeman's actions and, if so, to determine a reasonable amount of damages resulting from Freeman's conduct to be awarded in her favor.

## A.

First, Freeman argues that a restitution award is improper where, as here, it is based on conduct not charged in the Superseding Indictment. Although he concedes that he possessed images of Amy, he argues that because he was not charged with possession of child pornography—and there was "no evidence that he transported, advertised or received the images of Amy as part of the crimes charged in the [Superseding I]ndictment"—Amy cannot have been victimized within the meaning of § 2259. In support, Freeman cites United States v. Woods, 689 F. Supp. 2d 1102, 1106 (N.D. Iowa 2010).

In Woods, a grand jury returned a two-count indictment against the defendant, charging receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2)(A), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(5)(B). Subsequently, the defendant entered a plea agreement with the Government, in which he pleaded guilty only to the first count for receipt. The

second count, which included charges of possession of certain pornography involving a child named Vicky, was dismissed. At sentencing, the district court for the Northern District of Iowa determined that mandatory restitution under 18 U.S.C. § 2259(c) was improper, given the defendant's guilty plea only as to Count One obviated any possible finding as to Count Two and whether Vicky was a victim thereunder. It is that finding upon which Freeman now relies.

Woods is materially distinguishable from the instant case.[66] While Freeman, like the defendant in Woods, was not convicted of possession of child pornography, he was nonetheless found guilty of at least one offense charged by the Superseding Indictment that involved his possession of child pornography. Count Two of the Superseding Indictment charged Freeman with, among other things, conspiring to possess child pornography in violation of 18 U.S.C. § 2256(8)(A). That child pornography conspiracy necessarily includes the images of Amy, which were but a part of the child pornography found in Freeman's and all other defendants' possession and which were eventually admitted into evidence

---

[66] Even if Woods were not distinguishable, we are of course not bound by its holding. It is axiomatic that this Circuit is bound only by its own precedents and those of the Supreme Court, Bonner, 661 F.2d at 1209 ("[T]he decisions of one circuit are not binding on other circuits"), and certainly this is even more true in the context of a district court determination from another circuit.

100

at trial. Cf. United States v. Alas, 196 F.3d 1250, 1251-52 (11th Cir. 1999) (finding that member of conspiracy could be held liable for restitution for "reasonably foreseeable" acts committed by the conspiracy); see also United States v. Laney, 189 F.3d 954, 965-66 (9th Cir. 1999) (same). Unlike in Woods, where the defendant's charge for possession of child pornography was dismissed as a result of a plea deal, here Amy was found to be a victim of Freeman's offense of conviction. Therefore, Freeman's restitution is grounded not upon a crime of which he was not convicted, but instead upon the possession of child pornography that served as the bases for his numerous convictions.

### B.

Additionally, Freeman contends that Amy is not a victim within the meaning of § 2259. We have recently considered and rejected a similar argument in McDaniel. We do so again.

In McDaniel, a defendant was convicted of possessing child pornography, in violation of 18 U.S.C. §§ 2252(a)(5)(B) and 2256(8)(A). In addition to being sentenced to 60 months' imprisonment, the district court ordered restitution in the amount of $12,700.00. On appeal, the defendant argued that the child depicted in the pornography in his possession—Vicky, a 10-year-old girl that was being

101

raped—was not a victim within the meaning of § 2259(c). Finding that our Circuit has long recognized that minors in child pornography are the "primary victims" of such criminal activity, we observed that later dissemination of that pornography "exacerbates [the original] harm, not only by constituting a continuing invasion of privacy but by providing the very market that led to the creation of the images in the first place." McDaniel, 631 F.3d at 1208 (quoting United States v. Tillmon, 195 F.3d 640, 644 (11th Cir. 1999)). Thus, we recognized a cycle involving the sexual abuse of children, the production of child pornography, and heightened demand for more such abhorrent activity. Id. Given that cycle, we had no difficulty holding that Vicky was a victim within the meaning of § 2259(c). Id.

Likewise, we have no difficulty finding that Amy is a victim here. The evidence presented by the Government and the testimony submitted to the court at the restitution hearing support a finding regarding the devastating impact child pornography has had upon Amy's well-being. Raped as a four-year old and for years afterwards, Amy's victimization by her uncle is obvious. Although the victimization resulting from an individual's subsequent viewing of the resulting child pornography may be more subtle, both the Supreme Court and our Court have found that child pornography comprises a similar harm. Indeed, the Supreme

102

Court in Ferber noted that child pornography creates "a permanent record of the children's participation and the harm to the child is exacerbated by [its] circulation." 458 U.S. at 759. We echoed that concern in McDaniel, when we recognized that numerous harms "stem directly from an individual's possession of child abuse images." McDaniel, 631 F.3d at 1208. Here, the record before the district court of the harm done to Amy, both by her uncle and by possessors of child pornography like James Freeman, is unassailable. Accordingly, the district judge did not err in finding that Amy was a victim within the meaning of § 2259(c).

## C.

By its terms, Section 2259 requires restitution for a victim if he or she was "harmed as a result of a commission of a crime under this chapter." 18 U.S.C. § 2259(c). Upon such a finding of harm, restitution to the victim of child pornography is mandatory. See id. § 2259(a) (mandating a district court "shall order restitution for any offense under this chapter"); McDaniel, 631 F.3d at 1207. Moreover, Congress requires any such restitution to "pay the victim . . . the full amount of the victim's losses." 18 U.S.C. § 2259(b)(1). The amount of such losses is calculable by reference to certain costs incurred by the victim. See id.

§ 2259(b)(3)(A)-(F). Our interpretation of § 2259 limits any restitution order to damages proximately caused by the defendant's conduct. McDaniel, 631 F.3d at 1208.

Now, Freeman argues mere possession of child pornography—in the absence of production, recreation, or transportation of the same—is insufficient to constitute proximate cause of injury. In support, he points to several district court decisions—both within this Circuit and beyond—that found no proximate causation existed under similar circumstances. See, e.g., United States v. Faxon, 689 F. Supp. 2d 1344, 1356-57 (S.D. Fla. 2010) (denying restitution for lack of proximate cause); United States v. Van Brackle, No. 2-08-CR-042-WCO, 2009 WL 4928050 (N.D. Ga. Dec. 17, 2009) (same); Woods, 689 F. Supp. 2d at 1112 (refusing restitution where the Government had failed to satisfy its burden of showing that any of victim's "losses were caused by [d]efendant's possession of her images").

Our own holdings on this point are instructive. In particular, in McDaniel we considered a similar claim by the defendant in that case, who had argued that "restitution is appropriate only in cases where the defendant actually sexually abused a child or produced the child pornography because, in those cases, the

defendant's conduct actually harmed the child." <u>McDaniel</u>, 631 F.3d at 1209. In that case, the district court had ordered restitution of $12,700 against the defendant. We affirmed that order, recognizing that possession of child pornography is covered by § 2259, and that restitution is appropriate against those who possess child pornography as well as those who "sexually abuse[] a child or produce[] the child pornography." Indeed, we found that possessors of child pornography can constitute a "slow acid drip" of trauma, which may be exacerbated "each time an individual views an image depicting her abuse." <u>Id.</u> This slow drip resulted from the "extraordinarily distressing and emotionally painful" reaction suffered by the victim "each time an individual views an image depicting her abuse." <u>Id.</u> Therefore, our finding in <u>McDaniel</u> not only affirmed a § 2259 order for restitution against a possessor of child pornography, but it also recognized implicitly that a § 2259 restitution order is only appropriate where the Government can demonstrate the "slow drip" a <u>particular</u> defendant's actions had upon the victim.

This implicit requirement was made explicit by a recent Second Circuit case, <u>United States v. Aumais</u>, 656 F.3d 147 (2d Cir. 2011). In that case, a man named Gerald Aumais attempted to enter the United States from Canada, but was

pulled over at the border. Upon a search of his car, it was discovered that he possessed DVDs and other electronic storage devices, many of which contained thousands of still images of child pornography, as well as over one hundred videos of the same, some of which involved the sexual abuse of "Amy." Id. at 149. Aumais admitted that he owned all of the material, and further that he had downloaded it from a peer-to-peer network. After being indicted for transportation of child pornography under § 2252A(a)(1) and possession of child pornography under § 2252A(a)(5)(B), Aumais pled guilty to both counts.

Upon referral by the district court in that case, a magistrate judge considered whether restitution was proper for the injuries to Amy and, if so, in what amount. The magistrate judge heard testimony from a Government witness, Dr. Joyanna Silberg, that Amy's significant trauma was attributable to possessors of child pornography like Aumais, and that he should be responsible for the portion of her damages that were attributable to him as a "component" of her harm. Id. at 150. While the magistrate judge found that the party primarily responsible for Amy's harm was the uncle who sexually abused her, he nonetheless noted that Aumais' "posssession of [Amy's] images exacerbated the harm (originally caused by her uncle) by creating a market for distribution, and by inflicting the humiliation of

knowing that the images are out there being exploited by a group of consumers."

Id. at 151. Therefore, the magistrate judge recommended that a restitution award of $48,483 be awarded. The district court for the Northern District of New York adopted the magistrate's findings and recommendations. On appeal, the Second Circuit framed the relevant issue as "whether a defendant convicted only as a consumer of child pornography may be liable for restitution under 18 U.S.C. § 2259 to a child victim." Id. at 151-52.

Recognizing that it, like all but one other circuit, required proximate cause between a defendant's activity and a victim's harm,[67] the Second Circuit reexamined the evidence presented to the magistrate judge. Although it observed the thoroughness of the magistrate judge's findings, the appellate court nonetheless noted that no evidence was presented that linked Aumais' possession of child pornography depicting Amy to any losses suffered by Amy. Id. at 154-55.

---

[67] Indeed, according to the Aumais court, the only circuit to not require a finding of proximate cause is the Fifth Circuit. Id. at 152-53 (citing cases from the Third, Ninth, Eleventh, and D.C. Circuits in support of proximate causation requirement, but noting contrary finding by Fifth Circuit in In re Amy Unknown, 636 F.3d 190, 198 (5th Cir. 2011)). We note, however, that since Aumais, the Fifth Circuit on January 25, 2012 granted rehearing en banc in In re Amy Unknown, which is the representative Fifth Circuit case relied upon by the Second Circuit in Aumais.

Indeed, Dr. Silberg testified regarding the harm caused to Amy by Aumais'

possession of images and videos depicting her sexual abuse, even though Dr.

Silberg had interviewed Amy before Aumais was ever arrested. As such, the

Second Circuit made the relatively straightforward determination that proximate

cause cannot exist without a showing that a victim of sexual abuse learns of a

defendant's harmful possession of child pornography in which the victim is

depicted. Id. at 155.

Like the Aumais court, we make two findings here: 1) we affirm our holding

in McDaniel that end-user defendants may proximately cause injuries to the

victims of sexual child abuse; and 2) for proximate cause to exist, there must be a

causal connection between the actions of the end-user and the harm suffered by

the victim. The first finding has by now been adequately discussed. As to the

second finding, any other result would undermine the express wording of § 2259.

Proximate cause is required by the specific language of the statute. Since the role

of the judiciary is to "apply the text, not to improve upon it," Pavelic & LeFlore v.

Marvel Entertainment Group, 493 U.S. 120, 126 (1989), we apply the statute as

written, with its requirement of proximate cause. Any other result would turn

restitution for possession of child pornography into strict liability. We, like most

of our sister circuits to consider the issue, decline such an interpretation.[68]

While it is not our role to decide factual issues de novo,[69] our review of the

record shows no basis for determining whether Freeman's possession of child

pornography proximately caused any of Amy's harm. See United States v.

Singletary, 649 F.3d 1212, 1222 (11th Cir. 2011) (requiring any order of

restitution to be supported by a "district court's . . . specific factual findings"). Not

one of the witnesses called by the Government at the restitution hearing testified to

the actual harm caused by Freeman. Her attorney simply testified to his

representation of Amy, relying in part upon a calculation performed by a forensic

economist he had hired, which sought to calculate the cost analysis of Amy's lost

wages and future counseling as a consequence of her injuries. Similarly, Dr.

Cooper's testimony generally focused on the type of harm suffered by a victim of

---

[68] See, e.g., McDaniel, 631 F.3d at 1209; United States v Crandon, 173 F.3d 122, 125 (3d Cir. 1999); Laney, 189 F.3d at 965; United States v. Monzel, 641 F.3d 528, 535 (D.C. Cir. 2011).

[69] See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty., 450 F.3d 1295, 1306-07 (11th Cir. 2006) ("Appellate courts must constantly have in mind that their function is not to decide factual issues de novo.") (quotation marks and alterations omitted).

sexual abuse, which is magnified by the memorialization of such abuse for the purpose of child pornography. Dr. Cooper had never met with Amy, nor discussed with her any harm caused by Freeman. The third and final witness called by the Government, Dr. Silberg, admittedly evaluated Amy, but had not done so since Freeman's arrest and prosecution. As such, not one of the witnesses was capable of testifying as to the harm caused Amy by Freeman's possession of pornographic images memorializing her. Accord Aumais, 656 F.3d at 154 (finding that, because Dr. Silberg's interviews with Amy preceded the defendant's arrest, Dr. Silberg could not testify to "the impact on Amy caused by this defendant") (emphasis in original).

We do not seek to minimize the harm suffered by Amy. However, because 18 U.S.C. § 2259 was intended to compensate the victims of child pornography for harms caused by individual defendants and not to serve as strict liability against any defendant possessing such admittedly repugnant images or videos, we vacate the district court's restitution order with instructions to reconsider this question. We suggest that a full hearing would be appropriate, with notice to the parties that the issue is what, if any, damages were proximately caused by Freeman.

**D.**

110

The last issue, then, is the reasonableness of the district court's restitution award against Freeman. Although we need make no finding in this regard given our remand for consideration of proximate cause, we nonetheless note our concern regarding the proper assessment and allocation of damages under § 2259.

Like the Aumais court, we note that disparate decisions by district courts across the nation demonstrate that there is no universal means for determining a proper restitution amount. Compare Faxon, 689 F. Supp. 2d at 1356-57 (denying restitution for lack of proximate cause), and Van Brackle, 2009 WL 4928050, at *5 ("[T]he government has not presented any evidence whatsoever that would permit the court to estimate with reasonable certainty what portion of the claimants' harm was proximately caused by defendant's act of receiving child pornography, as opposed to the initial abuse or unknown other acts of receipt and distribution that occurred before and independent of defendant's act."), with United States v. Mather, No. 1:09-CR-00412 AWI, 2010 WL 5173029, at *5-6 (E.D. Cal. Dec. 13, 2010) (awarding $3,000 in restitution), and United States v. Staples, No. 09-14017-CR, 2009 WL 2827204, at *1 (S.D. Fla. Sept. 2, 2009) (awarding full amount of victim's damages, $3,680,153, against possessor of child pornography).

Nor is it clear when any such restitution award may be joint and several amongst any other defendants held responsible for a victim's harm. Section 2259(b)(2) mandates that any order of restitution must be "issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A." See also 18 U.S.C. 3664(h) (discussing joint and several liability, noting that "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."). It appears that the district judge may consider how an individual's conduct plays out in relationship to others involved. We leave resolution of these questions to the district judge in the first instance.

## X.

Having exhaustively reviewed the entire record and entertained oral argument, we AFFIRM Daniel Castleman's convictions and sentences on Counts One, Five, Seventeen, and Twenty-Eight, and VACATE Castleman's convictions and sentences on Counts Two and Forty.

We AFFIRM James Freeman's convictions and sentences on Counts One, Six, Eighteen, and Twenty-Nine, and VACATE Freeman's convictions and sentences on Counts Two and Forty. We further VACATE the district court's order of restitution against Freeman and REMAND to the district court to determine a restitution amount, if any, consistent with this opinion.

We AFFIRM Gary Lakey's convictions and sentences on Counts One, Eight, Nineteen, and Thirty-One, and VACATE Lakey's convictions and sentences on Counts Two and Forty.

We AFFIRM Marvin Lambert's convictions and sentences on Counts One, Nine, Twenty, and Thirty-Two, and VACATE Lambert's convictions and sentences on Counts Two and Forty.

We AFFIRM Neville McGarity's convictions and sentences on Counts One, Ten, Twenty-One, and Thirty-Three, and VACATE McGarity's convictions and sentences on Counts Two and Forty.

We AFFIRM William Mumpower's convictions and sentences on Counts One, Twenty-Two, and Thirty-Five, and VACATE Mumpower's convictions and sentences on Counts Two and Forty.

We AFFIRM Ronald White's convictions and sentences on Counts Two and Thirty-Nine, and VACATE Ronald White's convictions and sentences on Counts One and Forty. Because of the higher offense level accorded to the CEE conviction in Count One, we remand White's convictions on Counts Two and Thirty-Nine for resentencing. Only Defendant White need be resentenced.

**AFFIRMED** in part, **VACATED** and **REMANDED** in part.

HULL, Circuit Judge, CONCURRING in part and DISSENTING in part:

I concur in all of the majority's opinion except as to Section IV.B's discussion and conclusion as to Count 40, which charges the defendants with an obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2). The majority opinion concludes that Count 40 in the superseding indictment is constitutionally insufficient notice of the obstruction charge, even though Count 40 cites the statute, tracks the full language of § 1512(c)(2) and provides the factual elements of the crime. For the reasons below, I believe the majority opinion's conclusion is inconsistent with our precedent and incorrect in any event.

We read the indictment "as a whole." United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009). As the majority opinion recognizes, we "give the indictment a common sense construction, and its validity is to be determined by

114

practical, not technical, considerations." United States v. Wayerski, 624 F.3d 1342, 1349 (11th Cir. 2010) (quoting United States v. Poirier, 321 F.3d 1024, 1029 (11th Cir. 2003)); accord United States v. Gold, 743 F.2d 800, 812 (11th Cir. 1984). The indictment need only notify the defendant of the elements of the charged offense and enable the defendant to plead double jeopardy in the event of a later prosecution for the same offense. United States v. Woodruff, 296 F.3d 1041, 1046 (11th Cir. 2002); United States v. Yonn, 702 F.2d 1341, 1348 (11th Cir. 1983).

In light of this low threshold, we have explained on numerous occasions that an indictment referring to the statute upon which the charge is based adequately informs the defendant of the charge. See Wayerski, 624 F.3d at 1350 (rejecting challenge to indictment for child exploitation enterprise because indictment referred to 18 U.S.C. § 2252A(g)); United States v. Ndiaye, 434 F.3d 1270, 1299 (11th Cir. 2006) (rejecting challenge to indictment for providing false information because indictment referred to 42 U.S.C. § 408(a)(6)); United States v. Wims, 245 F.3d 1269, 1272 n.6 (11th Cir. 2001) ("[T]he indictment . . . charged [the defendant] with crimes by alleging violations of [21 U.S.C.] section 841(a) and put [the defendant] on notice that he was subject to potential life

imprisonment by claiming that his actions violated section 841(b)(1)(A)."); United States v. Fern, 155 F.3d 1318, 1325–26 (11th Cir. 1998) (rejecting challenge to indictment for making false statements because indictment referred to 42 U.S.C. § 7413(c)(2) and stating that, "[i]f an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge"); United States v. Gayle, 967 F.2d 483, 485 (11th Cir. 1992) (en banc) (rejecting challenge to indictment for impersonating an FBI agent because indictment referred to 18 U.S.C. § 912 and "use of the statutory language alone allows an indictment to withstand a motion to dismiss"); United States v. Critzer, 951 F.2d 306, 308 (11th Cir. 1992) (reversing district court's dismissal of indictment for providing false information because indictment referred to 18 U.S.C. §§ 1344(*l*) and 2113(a)); United States v. Alvarez-Moreno, 874 F.2d 1402, 1410 (11th Cir. 1989) ("An indictment charging a [continuing criminal enterprise] is sufficient for constitutional purposes if it articulates in statutory language the elements of the violation."); United States v. Stefan, 784 F.2d 1093, 1102 (11th Cir. 1986) (indictment for knowingly making false statement was sufficient because it referred to 18 U.S.C. § 1001); United States v. Edwards, 777 F.2d 644, 650–51 (11th Cir. 1985) (rejecting challenge to

116

indictment for tax evasion because indictment referred to 26 U.S.C. § 7201, which set forth the elements of the crime); United State v. Varkonyi, 645 F.2d 453, 456 (5th Cir. 1981)[1] (rejecting challenge to indictment for assault and interference against a federal officer because indictment referred to 18 U.S.C. § 111, which "direct[ed] the reader to 18 U.S.C. § 1114, wherein the reader would find a listing of the particular federal officers protected by the statute"); see also United States v. Adkinson, 135 F.3d 1363, 1375 n.37 (11th Cir. 1998) ("An indictment need do little more than track the language of the statute charged to be sufficient."); United States v. Chilcote, 724 F.2d 1498, 1505 (11th Cir. 1984) (explaining that "the indictment's reference to the statute" cured "[a]ny slight variation between the language of the indictment and the statute itself").  Likewise, the Supreme Court has explained that "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, so long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." Hamling v. United States, 418 U.S. 87, 117, 94 S. Ct. 2887, 2907 (1974)

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding Fifth Circuit precedent decided prior to October 1, 1981.

117

(quotation marks omitted); accord United States v. Ramos, 666 F.2d 469, 474

(11th Cir. 1982) (citing cases).

Here, Count 40 of the superseding indictment plainly meets these standards.

The indictment alleges:

> [t]hat between on or about October 1, 2005, through the date of the return of this superseding indictment [March 18, 2008], in the Northern District of Florida and elsewhere, the defendants . . . did corruptly obstruct, influence and impede and attempt to corruptly obstruct, influence and impede the due administration of justice in an official proceeding, in violation of Title 18, United States Code, Section 1512(c)(2).

The indictment not only identifies 18 U.S.C. § 1512(c)(2), the statute upon which

the charge in Count 40 is based, but also parrots the language of that subsection.

See 18 U.S.C. § 1512(c) (mandating fine and imprisonment for "[w]hoever

corruptly . . . (2) . . . obstructs, influences, or impedes any official proceeding, or

attempts to do so "). By tracking the statutory language, the indictment notified

the defendants of the essential elements of a § 1512(c)(2) offense. See United

States v. Mintmire, 507 F.3d 1273, 1289 (11th Cir. 2007) (identifying as elements

of a § 1512(c)(2) offense (1) an official proceeding was occurring; (2) the

defendant "engaged in conduct which constituted a substantial step toward the

commission of the crime"; (3) the defendant acted "corruptly"; and (4) "the natural

and probable effect of [the defendant's] conduct would be the interference with the due administration of justice" (quotation marks and alterations omitted)).

To be sure, we have also stated that an indictment is sufficient if it tracks the more general language of the statute <u>and</u> provides a statement of facts that gives notice. See <u>United States v. Schmitz</u>, 634 F.3d 1247, 1261 (11th Cir. 2011); <u>United States v. McNair</u>, 605 F.3d 1152, 1186 (11th Cir. 2010); <u>Jordan</u>, 582 F.3d at 1246; <u>United States v. Walker</u>, 490 F.3d 1282, 1296 (11th Cir. 2007); <u>United States v. Sharpe</u>, 438 F.3d 1257, 1263 (11th Cir. 2006); <u>Ndiaye</u>, 434 F.3d at 1299; <u>United States v. Bobo</u>, 344 F.3d 1076, 1083 (11th Cir. 2003); <u>see also</u> Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . .").

But even bare statements of facts have provided adequate notice under our standards. See <u>Sharpe</u>, 438 F.3d at 1263 n.3 ("It is not necessary for an indictment . . . to allege in detail the factual proof that will be relied upon to support the charges." (quotation marks and citation omitted)). And as shown by the many cases above, the language of the statute alone, setting forth the factual elements of the offense, often provides the essential facts and adequate notice. Indeed, we

have rejected challenges to indictments that articulate equal or less factual detail than Count 40.

For example, in United States v. Poirier, 321 F.3d 1024 (11th Cir. 2003), we considered two defendants' arguments that their indictment for wire fraud under 18 U.S.C. § 1343 was constitutionally insufficient because the indictment did not specify the money or property of which the victim was deprived. Id. at 1029. We rejected that claim because the indictment alleged that the defendants deprived the victims of "money and property." Id. (emphasis in original). We also rejected one Poirier defendant's argument that his indictment for honest-services fraud under 18 U.S.C. § 1346 was insufficient because it did not allege that the documents he unlawfully transmitted were confidential. Noting that the indictment stated that the defendant transmitted documents related to his employer's request-for-proposal, we explained that "[c]ommon sense tells us that the documents listed in the indictment constituted confidential information." Id.

In United States v. Yonn, 702 F.2d 1341 (11th Cir. 1983), the defendant claimed that his indictment on a charge of conspiracy to import marijuana was too vague to provide adequate notice of the charge. Id. at 1347–48. We rejected this challenge because the indictment, in addition to reciting the essential elements of

the offense, alleged that the conspiracy lasted from June 1, 1981 until the date of the indictment and "at least partially" described the conspiracy's locale as, "in the Northern District of Florida and elsewhere." Id. at 1348. "Taken as a whole," we explained, "these allegations adequately set forth the offense charged." Id. Relying on Yonn, we rejected a similarly worded indictment in United States v. Bascaro, 742 F.2d 1335 (11th Cir. 1984), abrogated in part on other grounds by United States v. Lewis, 492 F.3d 1219 (11th Cir. 2007); see also United States v. Cole, 755 F.2d 748, 759 (11th Cir. 1985) (rejecting challenge to indictment on charge of conspiracy to import marijuana where indictment specified time of conspiracy as "some unknown time prior to October 1, 1977, until the date of the filing of the original indictment" and location as in "St. Lucie, Dade, and Monroe Counties, within the Southern District of Florida, and elsewhere.").

The majority opinion concludes that even a "common sense construction" of Count 40 provides notice only that "the defendants obstructed an unknown official proceeding at some time in some place by some action." But Count 40 provides at least as much notice of the time and place of the defendants' crimes as the indictments in Yonn and Bascaro. Count 40 states that the defendants' obstruction of an official proceeding occurred "between on or about October 1, 2005, through

121

the date of the return of this superseding indictment [March 18, 2008]" and that the obstruction occurred "in the Northern District of Florida and elsewhere." The lack of additional or more detailed facts is constitutionally insignificant. See United States v. Steele, 178 F.3d 1230, 1234 (11th Cir. 1999) ("[T]he law is well settled that a failure to [specify an exact date of the alleged offense] does not in all circumstances preclude a defendant from preparing an adequate defense or protecting against double jeopardy."); United States v. Jenkins, 779 F.2d 606, 608 n.1 (11th Cir. 1986) ("The six year duration of the conspiracy charged, rather than being an indication of vagueness in the indictment, instead reflects the expansiveness of the joint enterprise undertaken by the defendants here . . . ."). This is especially so given the uncomplicated and straightforward nature of the particular crime at issue in Count 40, to wit, corruptly obstructing, influencing or impeding justice in an official proceeding.

Even assuming arguendo that an indictment for obstruction of an official proceeding must give more details as to the specific nature of the official proceeding obstructed, a "common sense construction" shows that the indictment here suffices. See Poirier, 321 F.3d at 1029. Though Count 40 does not describe the specific nature of the official proceeding that the defendants obstructed, the

122

indictment read "as a whole" surely does.  See Jordan, 582 F.3d at 1245.  Count 2,

which charged the defendants with conspiring to obstruct official federal grand

jury proceedings, states:

> Beginning in March of 2007, a federal grand jury sitting in Baltimore, Maryland, (and later in July of 2007, a federal grand jury sitting in Pensacola, Florida) conducted an investigation into allegations that the defendants were engaged in a child exploitation enterprise, in violation of Title 18, United States Code, Section 2252A(g).[2]

The indictment identifies no other official proceeding, and no count of the

indictment besides Counts 2 and 40 charges the defendants with offenses related

to obstruction of an official proceeding.  As a practical matter, then, the

defendants cannot credibly claim that Count 40's failure to identify the obstructed

proceeding left them with inadequate notice of the § 1512(c)(2) charge.

Allegations in one part of an indictment may inform allegations in other parts of

the same indictment.  See United States v. Cox, 664 F.2d 257, 258–59 (11th Cir.

---

[2] The discrepancy between the Count 40 allegation that the defendants' obstruction began around October 1, 2005 and the Count 2 allegation that an official proceeding began in March 2007 is attributable to 18 U.S.C. § 1512(f)(1), which states that "an official proceeding need not be pending or about to be instituted at the time of the [obstruction] offense . . . ."  Further, given that the proceeding need not even be pending at the time of the obstruction, an indictment under § 1512(c)(2) would seem to require less factual specificity than other substantive criminal charges.

123

1981) (concluding that indictment as to Count 6, conversion of government property of the value of $24,916.82, was sufficient because Count 4, conspiracy to convert government property, "clearly described the property and identified it by the same value"); see also Schmitz, 634 F.3d at 1262 n.10 ("[F]actual allegations in one count can inform or provide meaning to the factual allegations in another count." (citing Jordan, 582 F.3d at 1246)); Sharpe, 438 F.3d at 1264 n.4 (finding "foregoing factual allegations [in Count 1] sufficient to assert a conspiracy to launder money, as charged in Count 2."); Poirier, 321 F.3d at 1029 (rejecting claim that indictment was insufficient for failing to allege that unlawfully transmitted documents were confidential because "[o]ther parts of the indictment made it evident that the property involved was certain confidential information."); Fern, 155 F.3d at 1326 (concluding that it was an "entirely sensible inference that the false statements referred to in the indictment related to the specific allegations described earlier in the indictment"); United States v. Elkins, 885 F.2d 775, 782 (11th Cir. 1989) (concluding that indictment properly charged conspiracy to defraud even though conspiracy count charged only conspiracy to commit substantive offenses because "violations of the substantive offenses constituted fraud against the government"); Ramos, 666 F.2d at 474 (rejecting claim that

124

indictment for conspiracy to possess and distribute methaqualone was "unduly vague with regard to the time and place of the purported offense" in part because "the remaining substantive counts" of the indictment provided details as to time and place). Given the proceedings identified in Count 2, which charged a conspiracy to obstruct an official proceeding, it defies common sense to conclude that Count 40 provided insufficient notice for not identifying the same proceedings again.

This circuit has been loath to vacate criminal convictions merely because an indictment is imperfect. "[T]he appropriate test . . . is not whether the indictment might have been drafted with more clarity, but whether it conforms to minimal constitutional standards." Poirier, 321 F.3d at 1029 (quotation marks omitted). Indeed, the majority opinion cites only two cases in which we held that an indictment was insufficient for failing to include certain factual details. See Schmitz, 634 F.3d at 1259–64; Bobo, 344 F.3d at 1084–85. In both of these cases, the indictment's defects were far more egregious than Count 40's failure to identify the official proceedings identified elsewhere in the same indictment.

In Schmitz, the defendant challenged her convictions on four counts charging embezzlement, theft, fraud, conversion, and misapplication of funds

125

under 18 U.S.C. § 666(a)(1)(A).  Schmitz, 634 F.3d at 1260–61.  We held that the indictment as to the fraud charges in these counts was insufficient because they "provide[d] absolutely no factual detail regarding the scheme to defraud."  Id. (emphasis added); see id. at 1261 (explaining that the indictment alleged "no facts or circumstances" to support the charges).  Rather, the counts "simply allege[d] that [the defendant] did embezzle, steal, obtain by fraud and without authority convert to her own use, and intentionally misapply the salary and other benefits she received."  Id. at 1261 (quotation marks omitted).  Due to the utter lack of factual support in these counts, the government could not rely on facts alleged in other parts of the indictment to cure the defendant's lack of notice.[3]  In contrast, Count 40 alleges that the defendants obstructed an official proceeding at a certain place and time.  As noted above, the referenced proceedings are plainly those described in Count 2.  Accordingly, per Schmitz's own reasoning, the factual allegations in Count 2 "inform" the charge in Count 40.  Schmitz, 634 F.3d at

---

[3] We rejected the government's argument in Schmitz that the these counts were sufficient "if the indictment is considered as a whole, and given a common-sense construction."  Id. at 1261.  We explained that although "the factual allegations in one count can inform or provide meaning to the factual allegations in another count," factual allegations in one count cannot inform a separate count that "include[s] absolutely no factual detail, either directly or through express incorporation."  Id. at 1262 n.10.

126

1263 n.10 ("We are not dealing in this case with factual allegations in one count that simply inform or provide meaning to factual allegations in a separate count.").

In addition, the defective indictment in Schmitz alleged multiple grounds of criminal liability; the four counts at issue each charged embezzlement, fraud, theft, conversion and misapplication of funds. See id. at 1263 ("The federal-funds counts allege all five means by which § 666(a)(1)(A) can be violated."). Due to the lack of factual detail in these counts the defendant did not know whether the fraud allegation charged a discrete crime in addition to the allegations of embezzlement, theft and conversion or charged a mutually exclusive theory of criminal liability under § 666(a)(1)(A) for a single criminal act. Id. at 1262–63; see also Yonn, 702 F.2d at 1348 ("[A]n indictment must be sufficiently specific to inform the defendant of the charge against him . . . ."). Count 40 raises no such problem. That count charges the only offense punishable under § 1512(c)(2), and the purported missing factual detail relates only to the object of the defendants' obstruction, not to whether the indictment charges a crime. Moreover, the object of the obstruction—an official proceeding during a specified time in the Northern District of Florida and elsewhere— is identified. The alleged missing detail is more precise information about an identified object.

United States v. Bobo, 344 F.3d 1076 (11th Cir. 2003), is materially distinguishable on similar grounds. The indictment at issue in Bobo charged the defendant with one count of conspiring to "execute a scheme and artifice to defraud a health care benefit program" and one substantive count of the same, in violation of 18 U.S.C. § 1347(1). Id. at 1083–84. We vacated the defendant's conviction as to the substantive count because the indictment "contain[ed] no indication of what the government contended was unlawful about [the defendant's] conduct." Id. at 1084. Specifically, the substantive count did "not specify the scheme or artifice to defraud with which the government was charging [the defendant]" and failed "to mention a fraud in connection with the delivery or payment of health care benefits, items, or services," as required for criminal liability under § 1347(1). Id. Though the government alleged that the defendant offered money to a third party, "the government made no mention in the indictment of a federal statute which prohibits the type of conduct alleged here."

Id.[4] Count 40 is free of these defects because the alleged conduct is plainly unlawful.

Finally, I disagree with the majority opinion's conclusion that Count 40 is insufficient for failing to protect the defendants against future prosecution for the same offense. Though we have often explained that an indictment must "enable[] the accused to rely upon a judgment under the indictment as a bar against double jeopardy," Woodruff, 296 F.3d at 1046, neither the defendants nor the majority opinion cite a single case in which we invalidated an indictment on the double-jeopardy grounds alone. Rather, our decisions show that the constitutional requirements of an indictment travel together; so long as an indictment provides sufficient notice as to the charge and identifies the elements of the charged offense, the indictment provides sufficient protection against double jeopardy. See, e.g., Wayerski, 624 F.3d at 1349–50 (concluding that Count 1"was adequate to apprise the defendants of the charges and to plead double jeopardy in any future prosecution for the same offense"); Woodruff, 296 F.3d at 1048 (explaining

---

[4] After finding the indictment insufficient as to the substantive count, we found the indictment insufficient as to the conspiracy charge. Id. at 1086 ("Where the scheme to defraud alleged in the substantive count is not sufficient to state an offense, a conspiracy count based upon the charge must also be found deficient.").

129

standard and concluding that the indictment "was plainly sufficient"); <u>Stefan</u>, 784 F.2d at 1103 (explaining that indictment is sufficient if it "contains the elements of the offense charged" and "enables the accused to plead an acquittal or conviction in bar of future prosecutions" and concluding that "[t]he indictment in this case is adequate under this standard"). Because the indictment here provides sufficient notice of the charge as to time and place and the elements of the offense, the indictment provides sufficient protection against double jeopardy.

For these foregoing reasons, I conclude that Count 40 of the indictment is sufficient and thus would reach the remaining question of whether the evidence at trial was sufficient to convict the defendants in Count 40.